[Civ. No. 20869. First Dist., Div. One. April 20, 1964.]

TRANSPORT CLEARINGS-BAY AREA, Plaintiff and Appellant, v. EVELYN O. SIMMONDS, Defendant and Respondent.

Jacobs, Blanckenburg & May, Reynold H. Colvin, Healy & Robinson and John J. Healy for Plaintiff and Appellant.

David C. Rust and Hagar, Crosby & Rosson for Defendant and Respondent.

SULLIVAN, J.—In this action brought to recover certain sums allegedly paid by plaintiff in purchasing freight bills of defendant's trucking company, plaintiff appeals from a judgment entered on a jury verdict in favor of defendant and against plaintiff and also from an order denying plaintiff's motion for judgment notwithstanding the verdict.

Plaintiff, Transport Clearings-Bay Area (hereafter referred to as Transport) is a nonprofit corporation organized by a portion of the trucking industry for the purpose of purchasing the freight bills of its member carriers and collecting the amount of the bills from the obligors thereof. It has approximately fifty members consisting of various truck lines in the Northern California area. Defendant, Evelyn O. Simmonds, is an individual doing business in Berkeley, California, under the firm name and style of West Berkeley Express & Draying Company (hereafter referred to by the initials WBX). She was admitted to membership in Transport in 1953.

The freight bills purchased by Transport were actually

invoices issued by the member carriers to cover transportation services rendered to the debtor named therein. The debtor was usually the shipper if the freight was prepaid or the consignee if it was not. Generally speaking, the freight bills were of two types: local bills covering shipments moving in or out of the Bay Area and interline bills which were strictly bills between member carriers normally covering a pro rata share of the freight charges. Transport purchased the bills at a slight discount and then collected their face amount from the debtor. As a general practice, bills received by Transport at its office were mailed to the debtor either daily, every other day or once a week depending on the particular type of account. Transport however mailed checks to the members in payment of the assigned bills within 24 hours after receiving them.

On March 30, 1960, defendant and one Anton P. Skya entered into an agreement of purchase and sale covering WBX for a total price of $316,900, payable $25,000 not later than March 1960 and the balance in specified installments over a period of years. This agreement was subject to the approval of the California Public Utilities Commission and the United States Interstate Commerce Commission and provided that if such approvals were not secured by June 24, 1960, the obligations of the parties under the contract would forthwith terminate unless the time for approval was extended by mutual consent. On the same day the parties entered into a management agreement in the form of a letter directed by Skya to defendant and endorsed by the latter as ''accepted.'' In said letter, Skya stated that ''in anticipation that said approvals will be forthcoming,'' he proposed to manage the business of WBX commencing April 1, 1960, until the sale was approved or the contract expired, whichever occurred first, Skya agreeing to pay all expenses of WBX and retaining all net profits during the period as ''my compensation for such management.'' Defendant, on her part, was to be responsible for all liabilities of WBX as shown on its books at the close of business March 31, 1960, excluding payments on certain tractors and trailers.

Edward Simmonds, defendant's husband, had been the actual manager of WBX since 1956, defendant at that time ceasing to be active in the business. Defendant had been negotiating with Skya since January 1960. About March 1, 1960, Skya paid her $5,000 which was to be credited on the

initial payment of $25,000. In the middle of March she permitted him to take over the business of WBX, Skya having stated that he was anxious to tie in such operations with his trucking operations in the north. At about the same time Mr. Simmonds curtailed his activities at WBX. On March 30, 1960, he moved into an adjoining office in order to attend to more or less personal matters. On April 7, 1960, Skya appointed as manager of the business one Reuben Barclay, a former employee of defendant's, who remained with WBX after March 30.

Defendant gave no written notice of either agreement to Transport. Nor did she ever apply to the Public Utilities Commission for approval of the sale of WBX to Skya; or apply to the City of Berkeley for the transfer of her business license, or file with the county clerk any certificate of abandonment of the fictitious name under which she did business.

Beginning about April 1, 1960, and continuing until about July 18 or 20, 1960, Transport purchased from WBX certain freight bills which indicated thereon that the debtor was Custom Traffic Service, hereafter referred to as Custom. This was a corporation owned by Anton Skya, a fact which, as we point out *infra*, was known to Transport's manager prior to April 1, 1960. After purchasing WBX's bills against Custom, Transport paid WBX for them by check. Thereafter, following its normal collection routine of mailing bills to the debtor's address shown thereon, Transport mailed the bills to Custom Traffic Service, 1700 Sixth Street, Berkeley, California. This was the address of WBX from which, strangely enough, the bills had emanated. Transport thereafter collected from Custom 262 of the above bills, representing a total amount of $230,000, said bills being paid by Custom's checks drawn on a Seattle bank.

On June 27, 1960, Transport's manager, Albert Uniack, discovered that Custom's account was delinquent to the extent of $18,000 or $20,000. Upon checking WBX's bills, Uniack observed that the business of that company had increased by three to four times its normal operations and that the increase was due to one type of bill, namely those against Custom. He admitted that he had never before seen this type of bill coming from WBX in such consistently large amounts and that, from his experience, such bills represented a substantial increase in the volume of business for a firm of the

size of WBX. He immediately stopped the purchase from WBX of bills against Custom and telephoned Skya in Seattle. Uniack and Skya arranged a luncheon meeting in San Francisco on July 1, 1960. At this meeting Skya explained to Uniack that he was in the process of merging into one corporation several corporations which he owned "up north" and that the delay in paying Custom's bills arose from accounting difficulties pertaining to the merger. The outcome was that Uniack agreed to continue purchasing WBX bills against Custom on Skya's promise that he would bring Custom's account up to date promptly.

On cross-examination Uniack testified in pertinent part as follows: During the above luncheon meeting Skya detailed his operations and the many companies he owned, informing Uniack that he also owned WBX. The latter responded by advising Skya that he could not be the owner of WBX until the California Public Utilities Commission approved the transfer. Uniack eventually told Skya that Transport would again accept Custom's bills. However he denied telling the latter that he, *Skya*, could continue submitting such bills through WBX. On this last point he was impeached by earlier testimony given in a deposition where he admitted making such a statement on the occasion in question and acknowledging that Skya continued his course of conduct by submitting the bills. Uniack also talked with Skya at the meeting about WBX's reserve status, a confidential matter not normally discussed with a person who was merely a customer of a carrier and not the owner. He told Skya that WBX's reserve status would have to be increased in order to take care of the increased volume of billings due to Custom's operations and eventually agreed to postpone such increase until Skya was "caught up" on the delinquent account.

Uniack also admitted on cross-examination that as early as March 1960 he had met one Bob Miller, a business acquaintance, who had been employed by a number of firms in the trucking industry. At that time Miller told Uniack that Skya had obtained a job for him with WBX and that Skya was going to purchase WBX. According to Uniack, this was the first time he ever heard of Skya or of the impending purchase. Miller also told Uniack at this meeting in March that Skya owned Custom Traffic Service, informing Uniack of Skya's operations in the northwest; that Skya controlled routings of freight cars; and that cars from eastern shippers

would be coming into the Bay Area for unloading and distribution. Uniack admitted that Miller then asked him if Transport would purchase some of these bills and in reply he stated to Miller "Yes, we accept that type of freight bill." After receiving this information, Uniack made no inquiry of defendant, Mrs. Simmonds, to ascertain whether she was selling WBX to Skya. It is to be noted that no regulation or by-law of Transport required a member to give Transport notice of any sale or transfer.

At this point it is convenient to note Skya's testimony, introduced through his deposition, on the matter of his ownership of WBX. Skya testified that he had known Bob Miller for about six years prior to April 1, 1960. Although he knew Uniack was manager of Transport, he had never met him personally before June 1960. According to Skya, "Mr. Miller came to work for me as sales manager as I was traveling back and forth between Seattle and Berkeley, and I asked him to contact Mr. Uniack and advise him of the new ownership and methods of operation until I could do so in person at a later date." In March or April, Miller reported back to Skya that he had done so. As to the July 1 luncheon meeting with Uniack, Skya testified that he then told Uniack "I guess you know I am the new owner" to which the latter replied "Yes." According to Skya, Uniack told him that he had met Bob Miller and that he was glad to see "some new blood coming into the area." Skya also discussed the deposit required by Transport for financing the accounts receivable and expressed the hope that it would not be further increased. According to Skya, Uniack asked him if the deposit belonged to the former owners, whereupon Skya replied that he had purchased it in addition to all the other assets of the company.

After the above meeting of July 1, 1960, Transport resumed purchasing WBX's bills to Custom. By July 20, 1960, Transport had purchased a total of 124 such bills, paying WBX therefore a total of $111,182.59. By that time it was discovered that the checks of Custom received by Transport in payment of 70 of the bills had been dishonored by the Seattle bank on which they were drawn. No checks of any kind had been received for the remaining 54 bills. It was established at the trial that Transport was never able to locate any of the organizations appearing as debtors on 124 bills and that none of the bills represented freight services

performed by WBX. Transport immediately discontinued purchasing WBX bills against Custom. Uniack telephoned Skya in Seattle and arranged for a meeting in San Francisco on July 29, 1960, at the office of Transport's attorney, Mr. May.

At this meeting Transport agreed to accept from Custom Freight Handling (a different corporation than Custom Traffic Service) an unsecured promissory note dated August 1, 1960, payable on demand, in the sum of $111,239.14. This note was signed by Skya as president and in addition guaranteed by him personally. On cross-examination Uniack testified that before Uniack and Mr. May accepted the above note, they were shown a document entitled ''Custom Freight Handling, Inc. pro forma balance sheet'' which listed Skya's assets, among them WBX which was carried thereon as an investment with a value of $341,900. Skya told both men that he was transferring all his assets into this new corporation in which he owned the controlling interest. However no mention was made of the fact that the transfer of WBX to Skya had not been approved by the Public Utilities Commission.

Skya's version of the above July meeting differed somewhat from that given by Uniack and Mr. May. It is not necessary to detail this testimony except to point out that according to Skya, he told Uniack and Mr. May at the meeting that he had an equity of $40,000 or $47,000 in WBX and owned all the trucks and equipment ''free and clear.'' It was Skya's understanding when he signed the note that since he was then unable to pay the debt, he would have 30 days to raise the necessary funds.

On August 4, 1960, Uniack wrote to Transport's board of governors advising them for the first time of Skya's indebtedness and the acceptance of the promissory note. In this letter Skya was referred to as the owner of WBX. On August 18 the board directed Uniack and other members of the staff to obtain additional security for the note. Another meeting with Skya was held on August 19 at which additional security was demanded from Skya and each of his organizations. Skya assented to this demand and also agreed to deliver to Transport the ''pink slips'' to the WBX trucks. Another meeting was set for August 24, 1960. Skya did not appear and never delivered the required forms of guarantees or the pink slips to the trucks.

Transport immediately contacted the WBX office in Berkeley requesting permission to examine the company's records pertaining to the freight bills. It was then learned that no service had been performed by WBX for any of the delinquent bills but that all of the information contained in the bills had been received by WBX from Seattle, after which the bills were prepared at the Berkeley office and forwarded to Transport. On the same day, August 24, 1960, Transport wrote WBX advising that the bills against Custom had been erroneously submitted to it since investigation indicated that none of the bills represented charges due on cars handled in the local area. Demand was made on WBX to cover the deficit of $111,182.59 promptly.

It was established by uncontradicted evidence that all of the WBX freight bills against Custom which were purchased by Transport and represent the above delinquency here in controversy were prepared in the office of WBX in Berkeley either by Barclay or one Mrs. Tanksley, both long-time employees of defendant. The information necessary to make up these bills was telephoned daily to the Berkeley office from one of Skya's representatives in Seattle. The bills were prepared on the same printed forms previously used by defendant and bearing at the top the name West Berkeley Express and Draying Co. with the initials "WBX." Checks received by WBX from Transport upon purchase of the bills were deposited by Barclay in a bank account in the name of WBX.

Defendant testified that after she turned over the business to Skya in the middle of March 1960 and until the latter part of August 1960 she had no knowledge whatsoever about the bills against Custom or that such bills were being submitted to Transport. At no time during this period was she ever contacted by Transport. As we discuss *infra*, defendant contended in the court below that she transferred the business of WBX to Skya on or about March 31, 1960. Nevertheless the record establishes that approximately two and a half months later defendant filed with the California Public Utilities Commission an application for permission to execute a promissory note and deed of trust securing the same in favor of the Bank of America in the sum of $48,500 for the purpose of obtaining a loan in such amount from the bank. This application stated that defendant was doing business under the name of WBX and required the loan because she was short of

working capital and had also incurred obligations that had to be paid. The commission made an order granting such application. In the latter part of August she heard for the first time that Skya was having difficulty with Transport. After causing an investigation to be made and upon the advice of counsel, she thereupon rescinded the purchase and sale agreement.

Plaintiff's complaint filed September 2, 1960, as amended sought recovery of $109,293.73 in three counts: the first a common count for money had and received; the second count alleged that defendant, in violation of her agreement to be bound by plaintiff's rules and regulations, had submitted to plaintiff for payment between April 1, 1960, and July 31, 1960, invalid and fraudulent freight bills for which plaintiff had paid defendant the above amount; and the third count alleged that during the above period defendant through her agents had negligently submitted for payment by plaintiff freight bills which appeared to be valid and genuine but which in fact were invalid, fraudulent and worthless.

Defendant's answer, in addition to denials of all material allegations of the complaint, set forth in detailed allegations four affirmative defenses which may be summarized thusly: *First*, that Skya took over the ownership, control, management and operation of WBX for his own account and not as defendant's agent; that plaintiff had notice of this; and that plaintiff accepted the freight bills on behalf of Skya and relied on Skya's credit rather than on defendant's; *second*, that the acceptance by plaintiff of the promissory note dated August 1, 1960, resulted in a full satisfaction and discharge of all claims against Skya, WBX or any other party; *third*, plaintiff was barred from asserting any claim against defendant because of its own negligence and laches in that, among other things, the unusual characteristics and deficiencies of the bills against Custom were sufficient to have put plaintiff on inquiry and to have caused it to make inquiries of defendant in respect to the bills; and *fourth*, that since there was no reasonable possibility that defendant could proceed in turn against Skya for any liabilities sought to be imposed on her, plaintiff was estopped from presenting or prosecuting any claim against defendant.[1] In addition defendant cross-

---

[1]The allegations of the affirmative defenses overlap to some extent. The second and third defenses reallege all the allegations of the first

complained for $2,500 deposited by her with plaintiff. At the trial the court excluded all of defendant's affirmative defenses except that asserting estoppel against plaintiff and upon defendant's request dismissed without prejudice defendant's cross-complaint.[1a]

At the conclusion of the taking of evidence on both sides, plaintiff moved the court for an order directing the jury to return a verdict in favor of plaintiff leaving to the determination of the jury the amount of damages, if any, sustained by plaintiff.[2] The motion was denied. The case was then submitted to the jury which returned a verdict in favor of defendant. Plaintiff thereupon moved for a judgment notwithstanding the verdict which motion was denied. Judgment was entered on the verdict.

Plaintiff's position before us is basically this: (1) The court below erred in denying the motions for a directed verdict and for a judgment notwithstanding the verdict because the evidence raised no factual issues as to defendant's liability. This argument rests on two bases: (a) Since WBX was a public utility and no order was ever secured from the Public Utilities Commission authorizing its sale or other disposition, as a matter of law defendant remained its owner and was responsible for the acts of her agents in submitting the freight bills in question; and (b) as a matter of law there was no support for defendant's affirmative defense of estoppel. As part of its first contention plaintiff urges that the judgment and order appealed from be reversed with directions to fix the amount of damages by court or jury. (2) Assuming that the evidence did raise some factual issue as to defendant's liability, the court erred in giving certain instructions to the jury. As part of its second and alternative

---

defense; the fourth defense realleges all allegations of the first and third defenses.

[1a] At the start of the trial plaintiff dismissed all charges of negligence contained in the third count.

[2] Plaintiff's motion was made on the following grounds: That the evidence showed as a matter of law that defendant, at all pertinent times, was and remained the owner of and in control of WBX and was thus responsible for Skya's acts; that under the evidence none of defendant's affirmative defenses were assertible; and that as a matter of law defendant's affirmative defense of estoppel was not supported since defendant did not change her position because of any reliance upon the plaintiff's conduct.

contention, plaintiff seeks a reversal with directions for a new trial under proper instructions. Defendant's position is that the motion for judgment notwithstanding the verdict was properly denied because factual questions were presented and that the jury was properly instructed on the subjects complained of.

As we have pointed out (see footnote 2, *ante*), plaintiff's first contention here was asserted in the court below at the close of the evidence. Plaintiff's motion made at that time was in effect one for a directed verdict on the issue of liability. Applicable therefore are the following principles summarized by the court in *Walters* v. *Bank of America* (1937) 9 Cal.2d 46, 49 [69 P.2d 839, 110 A.L.R. 1259]: "The trial court, in a proper case, may direct a verdict in favor of a party upon whom rests the burden of proof, in this case the plaintiff. Substantially the same rules apply to directed verdicts in favor of plaintiffs as apply to such verdicts in favor of defendants. [Citations.] A directed verdict may be granted, when, disregarding conflicting evidence, and indulging every legitimate inference which may be drawn from the evidence in favor of the party against whom the verdict is directed, it can be said that there is no evidence of sufficient substantiality to support a verdict in favor of such party, if such a verdict has been rendered. [Citations.] In passing on the propriety of the trial court's action in directing a verdict, the doctrine of scintilla of evidence has been rejected in this state. [Citation.] A motion for a directed verdict may be granted upon the motion of the plaintiff, where, upon the whole evidence, the cause of action alleged in the complaint is supported, and no substantial support is given to the defense alleged by the defendant. [Citations.]" (See also *Parker* v. *James Granger, Inc.* (1935) 4 Cal.2d 668, 678-679 [52 P.2d 226], cert. denied 298 U.S. 644 [56 S.Ct. 958, 80 L.Ed. 1375]; *Price* v. *Atchison, T. & S. F. Ry. Co.* (1958) 164 Cal.App.2d 400, 408 [330 P.2d 933].)

Viewing the evidence in the instant case in accordance with the foregoing principles, we therefore face two pivotal questions: (1) As a matter of law, was defendant the owner of WBX during the period here involved and as such responsible for the acts of Skya and Barclay in submitting the disputed freight bills? (2) As a matter of law, does the evidence support defendant's affirmative defense that plaintiff

is nevertheless estopped from holding defendant thus responsible? We have concluded that the first question should be answered in the affirmative and the second in the negative.

█ The record shows without any conflict in the evidence that defendant's trucking business is a public utility.[3] Section 851 of the Public Utilities Code in relevant part provides: "No public utility other than a common carrier by railroad subject to Part I of the Interstate Commerce Act (Title 49, U.S.C.) shall *sell*, lease, assign, mortgage, or *otherwise dispose of* or encumber the whole or any part of its railroad, street railroad, line, plant, system, or other property necessary or useful in the performance of its duties to the public, or any franchise or permit or any right thereunder, nor by any means whatsoever, directly or indirectly, merge or consolidate its railroad, street railroad, line, plant, system, or other property, or franchises or permits or any part thereof, with any other public utility, without first having secured from the commission an order authorizing it so to do. Every such *sale*, lease, assignment, mortgage, *disposition*, encumbrance, merger, or consolidation made other than in accordance with the order of the commission authorizing it is *void.*" (Italics added.) The mandate of the statute is plain and clear. As this court said in *Slater* v. *Shell Oil Co.* (1940) 39 Cal.App.2d 535, 547 [103 P.2d 1043], in referring to the predecessor statute section 51a of the Public Utilities Act which contained almost identical provisions: "It is to be noted that this provision declares every transfer without consent of the Railroad Commission is void. That the section means what it plainly states, that a purported transfer in violation of the statute confers no rights on the transferee, and that third persons may raise this defense, is clearly established by the following cases: *Webster Mfg. Co.* v. *Byrnes,* 207 Cal. 630 [280 P. 101]; *Crum* v. *Mt. Shasta Power Corp.,* 220 Cal. 295 [30 P.2d 30]; *Napa Valley E. Co.* v. *Calistoga E. Co.,* 38 Cal.App. 477 [176 P. 699]." █ While the statutory mandate refers to property dedicated to public use (*City of Oakland* v. *El Dorado Terminal Co.* (1940) 41 Cal.App.2d 320, 328 [106 P.2d 1000]) and the statute specifically excludes from its operation sales or other transfers by a public utility of property which is *not* necessary or useful in the performance of its

---

[3]The pretrial conference order states: "Defendant was in the trucking business and admittedly was a public utility."

duties to the public,[4] the instant case cannot possibly fall within the exception to the rule since the uncontradicted evidence establishes that defendant was selling all of the assets of WBX.

■ Although a *transfer* of property within the ambit of section 851 may be void until approved by the commission, the statute does not prevent parties from entering into *contracts* for the sale or transfer of the assets of a public utility. (*Dillingham* v. *Schipp* (1957) 154 Cal.App.2d 553, 559 [316 P.2d 1014] ; *Bartlett* v. *Rogers* (1951) 103 Cal.App.2d 250, 253, 254 [229 P.2d 434].) ■ As the court said in *Bartlett, supra*: "Unquestionably that body [the Public Utilities Commission] has power to refuse to approve a sale or transfer as between a seller and a buyer, but its power is not exclusive of or equal to that of the courts. As between individuals or other entities such as corporations a transfer or sale of the assets of a public utility is void unless and until the Public Utilities Commission issues its order of approval. However, that fact does not bar parties from entering into contracts for the sale or transfer of the assets of a public utility." (P. 253.) In *Dillingham, supra,* the court upheld the validity of such an executory agreement which had been entered into subject to the approval of the Public Utilities Commission. Indeed the agreement of purchase and sale now before us and entered into by defendant and Skya on March 30, 1960, measures up to the rule announced in *Bartlett* and *Dillingham* and, like the agreement in *Dillingham,* is executory in character[5] and made subject to commission authorization.[6]

---

[4]The last paragraph of section 851 provides: "Nothing in this section shall prevent the sale, lease, encumbrance or other disposition by any public utility of property which is not necessary or useful in the performance of its duties to the public, and any disposition of property by a public utility shall be conclusively presumed to be of property which is not useful or necessary in the performance of its duties to the public, as to any purchaser, lessee or encumbrancer dealing with such property in good faith for value; provided, however, that nothing in this section shall apply to the interchange of equipment in the regular course of transportation between connecting common carriers."

[5]For example the first paragraph of the agreement states in part: "Seller *agrees to sell* to Buyer and Buyer *agrees to buy* from Seller all of the assets of WBX for a total purchase price of $316,900.00. ..." (Italics added.)

[6]The agreement contains the following provision: "It is mutually understood and agreed by and between the parties hereto if the approval of the Public Utilities Commission of the State of California and of

██ In the instant case, however, defendant in an apparent attempt to immunize herself from liability contends that she transferred her business to Skya, that both she and her husband removed themselves from its operation prior to April 1, 1960, and that Skya was actually the owner and the person responsible.[7] The statute and the above authorities furnish a simple but conclusive answer: There could be no transfer nor could defendant divest herself of ownership until authorization of the commission had been secured. This was never done. Any attempt to sell or transfer without such authorization is proscribed by law and void. To hold otherwise would be to emasculate the statute and frustrate its purpose.

██ The written agreements themselves entered into by the parties confirm the above conclusions. As already pointed out, the agreement of purchase and sale is conditioned upon the commission's approval of the sale (see footnote 6, *ante*) and provides for its own termination and the return of all consideration in the event of no approval. It is to be noted that although this agreement refers to a "date of transfer of title" at which time real and personal property taxes were to have been prorated and also provides for the execution and delivery by the buyer to the seller of a purchase money note and deed of trust for the balance of the price, the evidence discloses no such events of transfer of title or of the balance of the consideration. This is of course consistent with the

the United States Interstate Commerce Commission to the transfer and registration herein set forth is not secured by the 24th day of June, 1960, then and in such event the obligations of each of the parties under this contract shall forthwith terminate and any consideration paid by one of the parties to the other during such period of time shall be returned to the other party, unless said time is extended by mutual consent of the parties hereto.''

[7] In paragraph II of her first affirmative defense which is incorporated by reference into her fourth affirmative defense of estoppel, defendant alleges: "On March 30, 1960 it was further agreed by and between Skya and this answering defendant that, effective as of April 1, 1960 and continuing until the formalities of the transfer and sale of the business of WBX was accomplished, said Skya should enter into control of the fixed properties and equipment of WBX and should operate and manage the business of WBX for his own account and risk as the owner, . . .''

The pretrial conference order states: "The defendant admits that she was in business, as alleged, up to and including March 30, 1960. It is defendant's contention, however, that on or about said date she transferred her business to one Anton P. Skya; . . .''

contractual arrangements, the parties having agreed to make any transfer dependent upon prior authorization of the commission. The separate management agreement entered into on the same day was also consistent with the agreement of purchase and sale since it provided that Skya, the purchaser, was to manage the business *until the sale was approved.*[8] It is also to be noted that on June 15, 1960, during the period here in controversy and two and a half months after the execution of the above agreements, defendant filed with the Public Utilities Commission an application for authority to execute a promissory note and deed of trust. As we have pointed out, this application clearly shows that defendant was doing business as WBX, desired to borrow money for the business and proposed to encumber the property of the business.

Applying section 851 of the Public Utilities Code and viewing the evidence in accordance with the principles set forth above, we conclude that as a matter of law defendant remained at all times and during the period here in controversy was the owner of WBX.

Defendant argues that such a conclusion is not tenable because section 851 "has no applicability to the dealings of third parties with one of the parties to a sale or transfer of a public utility under the facts of this case" citing *Hanlon* v. *Eshleman* (1915) 169 Cal. 200 [146 P. 656] and *Hempy* v. *Public Utilities Com.* (1961) 56 Cal.2d 214 [14 Cal.Rptr. 436, 363 P.2d 476]. Neither case supports defendant's proposition.

In the case first cited, Hanlon entered into a contract with one Durfy to buy the latter's land and water system and thereupon filed a petition with the California Railroad Commission (now the Public Utilities Commission) praying for an order authorizing the sale of the water system pursuant to section 51a of the Public Utilities Act now section 851 of the

---

[8]The management agreement states in pertinent part: "As I have entered into a contract with you for the *purchase of the assets* of West Berkeley Express and Draying Co. and the *transfer* of Public Utility Commission *permits* and Interstate Commerce Commission *registrations*, which contract *is subject to the approval* of the Public Utilities Commission of the State of California and the Interstate Commerce Commission, and, *in anticipation that said approvals will be forthcoming* within the time specified in the contract between us, I propose to manage the business of West Berkeley Express and Draying Co. commencing on the 1st day of April, 1960, *until said sale is so approved or said contract expires,* whichever event shall first occur, upon the following basis: ..." (Italics added.)

Public Utilities Code. Before this petition was acted upon, Durfy filed a petition setting forth his contract with Hanlon, but alleging that it would be in the public interest to sell to a municipality rather than to Hanlon, and praying for such order as the commission might deem to be in the public interest. Durfy filed a second petition seeking authorization to sell a portion of the property to the municipality. The commission dismissed the first two petitions and authorized Durfy to sell to the municipality. Hanlon thereupon brought an original proceeding in mandamus to compel the commission to pass upon his application. His petition for such a writ was denied, the court holding that the power with which the commission was invested under section 51a was merely permissive and that the application for authorization should be made by the owner of the public utility because the authority must run to such owner. The court said: "The commission's power is to be exercised for the protection of the rights of the public interested in the service, and to that end alone. The sales, leases, or encumbrances affected by section 51a are dispositions of property of a public utility 'necessary or useful in the performance of its duties to the public.' *The owner may not transfer such properties unless authorized by the commission.* All that the commission is concerned with, therefore, is whether a proposed transfer will be injurious to the rights of the public." (Pp. 202-203; italics added.)

In the *Hempy* case, *supra*, it was held that the Public Utilities Commission in making an order pursuant to section 851 authorizing the transfer of certain highway operating rights of a highway common carrier acted in excess of its jurisdiction in affixing thereto a condition that certain creditors of the transferors be given preferential treatment. The court said: "The Public Utilities Commission is nowhere expressly given the power to adjudicate the rights between a public utility subject to its regulatory powers and its general creditors or those asserting contract rights against it. ... In the absence of a legislative grant to the respondent of power to adjudicate the relative rights of the creditors of a public utility, we can find no theory under which it has acquired jurisdiction to do so. In cognate situations we have held that the commission has no jurisdiction to adjudicate contract rights asserted by third persons against a public utility, but that the proper forum for such adjudication is the superior court. [Citations.]" (56 Cal.2d at pp. 217-218.)

It is quite obvious to us that both of these decisions deal merely with the nature and extent of the commission's jurisdiction and powers exercisable under section 851 (and its predecessor § 51a). Nowhere do these decisions hold either by express statement or reasonable implication that, as defendant now urges, section 851 has no applicability to the dealings of a third party with one of the parties to a sale or transfer. The effect of such an interpretation would be to suspend the operation of the statute as to defendant. The clear words of the statute forbid this. Defendant is subject to the requirements of the statute and to the results flowing from a failure to meet such requirement as not only the *Slater* case holds but even the *Hanlon* case on which defendant relies, makes clear in the sentence italicized above.

We proceed to consider whether defendant as the owner of the business is liable as a matter of law for the submission of the freight bills here in controversy. ▮▮ . Defendant argues that it cannot be said as a matter of law that Skya was her agent and, even assuming that he was, that he acted within the scope of his authority in submitting the bills in question. We disagree. Since the law prevented Skya from becoming the owner and since defendant, as we have explained, at all times remained the owner, the evidence, without conflict, leads to the ineluctable conclusion that Skya was the agent of defendant. By written agreement he became the manager of the business (see footnote 8, *ante*). Defendant cannot disavow this relationship of principal and agent upon the claim that Skya was managing the business for his own account and that she had no liability beyond March 31, 1960.[9] To permit her to do so would be in effect to make Skya the *owner* of the business. Any such disposition or purported transfer is void. (Pub. Util. Code, § 851; *Slater* v. *Shell Oil Co.*, *supra*, 39 Cal.App.2d 535, 547.) Defendant cannot circumvent the above statute and through the vehicle of a management arrangement invest Skya with all the attributes of an owner before securing authorization to make him the owner. As the manager of defendant's business, Skya was defendant's agent.

[9]It will be recalled that by the management agreement Skya was to manage the business ''upon the following basis'': Skya paying all expenses and taxes after March 31, 1960, and keeping the net profits as ''my compensation for such management'' and defendant being liable for all liabilities on the books of the company on March 31, 1960.

 It is also an inescapable conclusion that Barclay (as well as Mrs. Tanksley) was defendant's agent. The evidence without conflict shows that Skya named him manager on April 7, 1960; that after April 1, 1960, he took "directions" from Skya but none from defendant or her husband; that before April 7 his duties at WBX consisted of "[r]ating, billing and clerical duties" and on and after April 7 he "continued doing the rating, billing and clerical duties, and assumed extra duties as manager of the company"; that aside from assuming the manager's duties, he did the same type of work after April 1, 1960, as he did for defendant before that date; and that on September 1, 1960, after defendant rescinded the agreement of sale with Skya, Barclay started again "to retake instructions" from Mr. Simmonds, defendant's husband, who again became manager. The net effect of all this is that Barclay remained an agent of the owner, defendant herein, taking directions from defendant's agent Skya during the period April 1 to September 1 and thereafter from defendant's husband just as he had done prior to April 1, 1960.

We now face the crucial question whether or not under the facts summarized herein, disregarding conflicting evidence and indulging in every legitimate inference in favor of defendant, the defendant is liable, as a matter of law, for the acts of Skya and Barclay in submitting the freight bills. We think that both agents had actual implied authority to present the bills.

"Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." (Civ. Code, § 2316.) However it is not indispensable that actual authority be shown by an express agreement. (*County First Nat. Bank* v. *Coast Dairies & Land Co.* (1941) 46 Cal.App.2d 355, 364 [115 P.2d 988].) Actual authority may be implied as well as express. (*Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 450 [159 P.2d 958].) Skya was the manager of the business and thus the general agent of defendant. (See Rest. 2d Agency, § 3.) "[T]he implied powers of a general agent or manager are very broad, embracing authority to do all acts customarily connected with the business in which he is engaged." (*Hobart* v. *Hobart Estate Co., supra*; *Miller* v. *Wood* (1961) 188 Cal.App. 2d 711, 713-714 [10 Cal.Rptr. 770].) Civil Code section 2319 in

pertinent part provides: "An agent has authority: 1. To do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency; . . ." (Cf. Rest. 2d Agency, §73.)[10] ■■■ There can be no question here that the submission of WBX freight bills to Transport for purchase by the latter and the receipt of checks payable to WBX representing the proceeds of such sales were acts customarily connected with the business and relating to its ordinary operations. Indeed the evidence without conflict shows that after Skya took over the management of the business, the same procedures of submitting bills to Transport continued without interruption. The business actually "continued itself." As part of these customary procedures Barclay performed the same billing and clerical duties and in the course of them used the same printed forms of WBX bills in his transactions with Transport. The only difference was that he took his directions from Skya as manager instead of from Mr. Simmonds and in the course of the events here in controversy received from Skya the information for the bills prepared by WBX against Custom subsequently found to be invalid and worthless.

Defendant argues that there is no evidence that she gave Skya actual authority to submit to Transport freight bills of WBX against Custom or to act as he did in thus causing fraudulent and worthless bills to be submitted. She does not make clear whether she claims an absence of actual *express* authority or actual *implied* authority. As we have pointed out, both Skya and Barclay had actual *implied* authority to submit WBX freight bills to Transport. ■■■ Defendant cannot escape liability because Skya misused this authority by directing the preparation and submission of worthless and fraudulent bills for purchase by Transport. ■■■ It is well

[10]Rest. 2d Agency, § 73 states: "Unless otherwise agreed, authority to manage a business includes authority:

"(a) to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it;

"(b) to procure equipment and supplies and to make repairs reasonably necessary for the proper conduct of the business;

"(c) to employ, supervise, or discharge employees as the course of business may reasonably require;

"(d) to sell or otherwise dispose of goods or other things in accordance with the purposes for which the business is operated;

"(e) to receive payment of sums due the principal and to pay debts due from the principal arising out of the business enterprise; and

"(f) to direct the ordinary operations of the business."

settled that a principal is liable to third persons not only for the negligence of his agent in the transaction of the business of the agency but also for the frauds or other wrongful acts committed by such agent in and as a part of the transaction of such business. (Civ. Code, § 2338; *Bank of California* v. *Western Union Telegraph Co.* (1877) 52 Cal. 280, 287-288; *Otis Elevator Co.* v. *First National Bank of San Francisco* (1912) 163 Cal. 31, 39 [124 P. 704, 41 L.R.A. N.S. 529]; *Muehlebach* v. *Paso Robles Springs Hotel* (1924) 65 Cal.App. 634, 641, 645-646 [225 P. 19]; *Grigsby* v. *Hagler* (1938) 25 Cal.App.2d 714, 715-716 [78 P.2d 444].) The principal is liable under the above rule even though he received none of the fruits of the fraud. (*Gift* v. *Ahrnke* (1951) 107 Cal.App. 2d 614, 622 [237 P.2d 706]; *Wells Fargo Bank* v. *Dowd* (1956) 139 Cal.App.2d 561, 575 [294 P.2d 159].) The case of *Torrance Nat. Bank* v. *Enesco Federal Credit Union* (1955) 134 Cal.App.2d 316 [285 P.2d 737], cited by defendant, is distinguishable from the case before us since there the agent had neither actual nor ostensible authority.

Is the plaintiff nevertheless estopped from holding defendant responsible under the foregoing principles?

██ " 'In general, four things are essential to the application of the doctrine of equitable estoppel: first, the party to be estopped must be apprised of the facts; second, he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; third, the other party must be ignorant of the true state of facts; and fourth, he must rely upon the conduct to his injury.' " (*Safway Steel Products, Inc.* v. *Lefever* (1953) 117 Cal.App.2d 489, 491 [256 P.2d 32]; in accord *Johnson* v. *Johnson* (1960) 179 Cal.App.2d 326, 330 [3 Cal.Rptr. 575].) ██ In *Newhall* v. *Hatch* (1901) 134 Cal. 269, 274 [66 P. 266, 55 L.R.A. 673], it is said: "Mere silence on the part of a party will not create an estoppel, unless he was under some obligation to speak, and a party invoking such estoppel must show that it was the duty of the other to speak, and that he has not only been induced to act by reason of such silence but that the other had reasonable cause to believe that he would so act." (See also *People* v. *Ocean Shore Railroad, Inc.* (1948) 32 Cal.2d 406, 421-422 [196 P.2d 570, 6 A.L.R.2d 1179].) ██ The burden is on the party asserting an estoppel to establish all of the elements constituting it. (*Bear Creek Co.* v. *James* (1953) 115

Cal.App.2d 725, 732 [252 P.2d 723].) ▮▮▮ The doctrine of estoppel must be applied strictly and established in every particular. (*Bear Creek Co.* v. *James, supra.*)

The evidence pertinent to defendant's affirmative defense of estoppel, examined after disregarding conflicting evidence and indulging in every legitimate inference in favor of defendant, can be summarized as follows: In March 1960, and therefore before the agreements here discussed were executed, plaintiff through its manager Uniack learned from Bob Miller that Skya was going to purchase WBX. At the same time Uniack learned that Skya owned Custom and was informed of Skya's operations as we have heretofore summarized. During the months of April, May and June, plaintiff purchased from WBX a large number of its freight bills against Custom and collected said bills from Custom. It is a reasonable inference that Transport must have observed this substantial increase in WBX business involving Custom. At any rate, at the end of June, Uniack definitely knew that the increase in WBX bills to the extent of three to four times its normal volume was due solely to the bills against Custom. At the luncheon meeting of July 1, 1960, Uniack was informed by Skya that the latter regarded himself as the owner of WBX.

We have already set forth and need not here repeat the discussions of Uniack and Skya at the meeting of July 1 relative to bringing Custom's delinquent account up to date, to the continued submission by WBX of bills against Custom and Uniack's agreement to accept them, and to the prospective increase of WBX's reserve status; and in addition, the ensuing events in the course of which Uniack attempted to collect the subsequent and much larger delinquency, accepted a promissory note from one of Skya's companies, and finally in reporting these matters to Transport's board of directors stated that Skya was the owner of WBX, thus giving rise to the inference that Uniack regarded him as such. At no time did plaintiff make any inquiries of defendant as to whether Skya was the owner of WBX. Nor did plaintiff inform defendant of any of the foregoing developments including the delinquencies in the payment of the bills against Custom until shortly prior to the commencement of the instant action.

The essence of defendant's affirmative defense of estoppel is this: that since Transport failed to inform her at any time

of any of the foregoing matters, including its dealings with Skya and the delinquencies of Custom until it was no longer possible for defendant to have any recoupment against Skya, plaintiff is therefore estopped from holding defendant responsible.

Contrary to defendant's claim, the evidence as a matter of law fails to establish the defense of estoppel. There is no evidence whatsoever that defendant relied upon any conduct of plaintiff or that defendant by reason thereof was induced to take or to refrain from taking some particular action. (See *Safway Steel Products, Inc.* v. *Lefever, supra,* 117 Cal.App.2d 489, 491.) The undisputed evidence is that defendant having dispensed with the managerial services of her husband and having agreed to the management of WBX by Skya, permitted the latter to conduct the operation of the business. Nor can it be said that the "mere silence" of plaintiff in not communicating with defendant creates an estoppel. Defendant has not shown by any evidence that Transport was under a duty to speak or that she was in some way induced to act because of such silence. (*Newhall* v. *Hatch, supra,* 134 Cal. 269, 274.) In dealing with Skya, Uniack was dealing with the person to whom defendant had entrusted the management of her business. The ultimate situation for which defendant now disclaims responsibility was thus made possible by defendant herself who placed it within Skya's power to use the billing procedures of defendant's business in the manner discussed above.

Finally we must determine whether upon the whole evidence, considered in the light of the rules announced earlier, any substantial support is given to any other defense alleged by defendant. (*Walters* v. *Bank of America, supra,* 9 Cal.2d 46, 49.) It will be recalled that defendant in her answer raised three other affirmative defenses in addition to the defense of estoppel. A reading of the record satisfies us that the second and third affirmative defenses, namely those of discharge and satisfaction and of negligence and laches were abandoned by defendant at trial.[11] Defendant makes no

---

[11]The record discloses no instructions offered on either of these defenses. The instructions given make no mention of them. It is a fair inference from the record that the defense of negligence and laches was interposed only to countervail plaintiff's allegations of negligence in the third count. As already pointed out, at the start of the trial, plaintiff filed a ''Partial Dismissal,'' dismissing ''all of the allegations and charges of negligence and carelessness as contained and set forth in the

mention of them in her brief filed here and advances no argument that they are supported by the evidence. Even if not abandoned, they would not in our opinion be supported by the evidence.

As we have explained (see footnote 11, *ante*), the record discloses that at the conclusion of the evidence, defendant asserted two affirmative defenses—novation and estoppel. At that point in the proceedings, the court below on motion of plaintiff's counsel, struck the defense of novation on the ground that there was no evidence to support it. It is notable that defendant makes no claim on this appeal that such ruling was error. Although defendant has not appealed, it would be permissible for her to advance the contention that while as a matter of law her defense of estoppel was not supported, plaintiff was not prejudiced by the court's error to so hold, since plaintiff was precluded from obtaining a directed verdict on the issue of liability, by the defense of novation which *is* supported. (Code Civ. Proc., § 956.) Defendant has made no such claim before us and we might well conclude that she has waived it.

Nevertheless we have examined the evidence and have concluded that it offers no support to the defense of novation and that the court's order striking such defense was properly made. Applicable here are the following principles summarized in *Alexander* v. *Angel* (1951) 37 Cal.2d 856, 860 [236 P.2d 561]: "A 'novation is the substitution of a new obligation for an existing one.' (Civ. Code, § 1530.) One of the ways a novation may be consummated is 'by the substitution of a new debtor in place of the old one, with intent to release the latter.' (Civ. Code, § 1531.) Novation must be pleaded either expressly or 'by unequivocal implication,' and the burden of proof is 'upon the party asserting its existence.' [Citations.] The 'question whether a novation has taken place is always one of intention' [citation], with the controlling factor being the intent of the obligee to effect a release of the original obligor on his obligation under the original agreement. [Citation.]"

Here, as the trial judge noted in striking the defense of novation, "there is not one iota of evidence in this

<hr>

'Third Cause of Action' ..." The record indicates that upon the filing of such dismissal, the defense of negligence and laches was abandoned. This left two defenses—novation and estoppel—as the colloquy between court and counsel at the conclusion of the evidence indicates.

whole record that there was ever any discussion between Mr. Uniack and Mr. Skya that this was to be a new debt substituted for an old.'' Uniack never intimated to Skya that the transactions entered into between them were to be deemed in any way a release of any obligations incurred by Mrs. Simmonds to Transport. Lacking the necessary intent on the part of Transport to effect a release of defendant from her obligations, there could be no novation as a matter of law.

We therefore conclude that as a matter of law defendant, at all times the owner of WBX, was responsible for the submission to plaintiff by Skya and Barclay of the freight bills in question and that defendant's asserted defenses to such liability are not supported by the evidence. In our view the trial court, as plaintiff here urges, should have so instructed the jury leaving for their determination the amount of plaintiff's damages. We therefore conclude that the judgment and order appealed from must be reversed and a new trial had on the issue of damages alone, the amount of such damages to be determined by a jury, or if a jury is waived, by the court, under appropriate instructions or upon appropriate findings of fact and conclusions of law, as the case may be, to the effect that defendant is liable to plaintiff as a matter of law and that on the issue of liability the facts require a verdict or judgment in favor of plaintiff and against defendant. In view of these conclusions it becomes unnecessary to discuss the other points raised on this appeal.

The judgment and order appealed from are reversed and the cause is remanded for a new trial solely upon the issue of the amount of damages with directions to the trial court to direct a verdict or render judgment in favor of the plaintiff for the amount of damages so found upon a determination of that issue by a jury or the court, as the case may be, under the directions and in conformity with the views herein expressed.

Bray, P. J., and Molinari, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 16, 1964.