[Civ. No. 23137.   First Dist., Div. One.   Nov. 14, 1966.]

WARE SUPPLY CO., Plaintiff and Respondent, v. SACRA-
MENTO SAVINGS AND LOAN ASSOCIATION, De-
fendant and Appellant.

William A. Sitton for Defendant and Appellant.

Tinning & DeLap and Robert N. Sanford, Jr. for Plaintiff and Respondent.

SULLIVAN, P. J.—In this action seeking recovery on a materialman's bonded stop-notice claim made pursuant to Code of Civil Procedure section 1190.1, subdivision (h), defendant Sacramento Savings & Loan Association (Sacramento) appeals from a judgment entered in a nonjury trial against said defendant and in favor of plaintiff Ware Supply Co. (Ware) in the sum of $7,362.42 together with interest from January 22, 1964 and costs. While defendant's notice of appeal states that said defendant appeals from the whole of the judgment, it is evident from its statements before us that only $5,080 is actually at issue.

The facts are not in dispute. Robin Development Co., Inc. (Robin) owned certain real property in Hayward on which it desired to build an apartment house. John H. Payne was en-

gaged by Robin as the general contractor for the job. On June 20, 1963, Sacramento on the one hand and Robin and Payne on the other entered into a written building loan agreement pursuant to which Sacramento made a construction loan to Robin in the total principal sum of $325,000 secured by a first deed of trust on the above property. The agreement by its express terms provided for the disbursement by Sacramento of the proceeds of the loan in accordance with a so-called "Loan Order Plan"[1] or voucher system. (See Ilyn, *Stop Notice!— Construction Loan Officer's Nightmare,* 16 Hastings L. J. 187, 193.)

Carl W. Ferrell, called as a witness by plaintiff, testified that during 1963 he was the business manager of the John Payne Construction Company; that a few days before the signing of the building loan agreement on June 20, 1963 he discussed with the head loan officer of Sacramento (whose name he did not recall) the manner in which the loan funds were to be disbursed; that such conversation was had in the presence of Mike Ross, the actual owner of Robin; that in setting up the procedure for the disbursement of the loan funds he insisted on behalf of his company that the money be paid directly to Payne, the general contractor; that Sacramento's loan officer objected to this arrangement, stating that it was their normal procedure to pay the subcontractors and suppliers direct after being so authorized by the owner and the contractor; and that the witness gave the following reasons for insisting on payment to the general contractor: "Our normal operation was to have the money come directly to us and we paid the subs and suppliers with our own checks and that is what I told him. That is the only way we would take the job. Otherwise, they could get another contractor. . . . we were operating on a large basis. We had anywhere from three to four million dollars worth of work going. It made it much

---

[1]In connection with said loan order plan the agreement provided in pertinent part: "The undersigned owner or *contractor,* or both, or the duly authorized agent of either, may present to the Association a *written loan disbursement order,* drawn upon the moneys in said account, payable to a *contractor, materialman or laborer* for work done or materials furnished in such construction. The presentation to the Association of such order *shall constitute a representation* on the part of the undersigned that *the moneys therein referred to have been used in the construction* of the improvements herein referred to, and the Association shall be entitled to rely thereon and shall be held free and harmless from all liability in connection therewith. Such orders may be approved and paid by the Association *upon such terms and conditions as it may see fit to impose.*" (Italics added.)

simpler for us to pay the subs and the suppliers."[2] In any event, according to the witness, a procedure was established under which Payne, the general contractor, would submit to Sacramento "payout vouchers" with supporting labor and material releases covering the items listed in the voucher and upon approval by Sacramento would receive from the latter a check payable to Payne for all items so listed.

During November 1963 Ware furnished labor and materials for the job of a reasonable value of $7,362.42 which is the amount of the judgment. Of this amount the sum of $5,080 represented the reasonable value of windows supplied and installed by Ware prior to November 14, 1963. As we have said, this is the only amount in issue on this appeal.

On November 14, 1963 Payne presented to Sacramento on the latter's printed form a payout voucher requesting payment of $12,780 for six items of labor and materials furnished to the Robin job and listed on the voucher.[3] Attached to the payout voucher on Sacramento's printed forms were "material releases" signed by the various subcontractors and materialmen covering all six items. Among these releases was one by plaintiff signed on its behalf by Ernest Ware, its president, for the sum of $5,080 for the furnishing and installation of windows.

At the top of the release form appear the words "MATERIAL RELEASE." Immediately below these in somewhat smaller lettering are the words: "WAIVER OF MECHANIC'S LIEN RIGHTS AND CERTIFICATE TO PRODUCE PAYMENT—Materials— Full or Partial"; all of these last words are underlined. After instructions with respect to its completion,[4] the release reads

---

[2] It is notable that the foregoing testimony was received largely without objection by defendant. Although initially an objection was made on the general grounds of lack of competency, relevancy and materiality and the further ground that it constituted "an attempt apparently to vary the terms of a document which was subsequently, admittedly, *signed by Ware Supply Company*" (italics added), no objection to such testimony was interposed to the effect that the subsequent agreement of June 20, 1963 constituted an integration superseding all such preliminary negotiations. (Civ. Code, § 1625; Code Civ. Proc., § 1856; Rest. Contracts, § 228; see *Estate of Gaines* (1940) 15 Cal.2d 255, 264, 265 [100 P.2d 1055].)

[3] At the top of the form appears the following: "NON-NEGOTIABLE CONSTRUCTION LOAN ORDER PAYOUT VOUCHER (MUST BE ACCOMPANIED BY LABOR AND MATERIAL RELEASES)." At the bottom appears the following: "NOTE: Attach all receipts and original bills. Orders for payment to Sub-Contractors shall in all cases, be accompanied by Releases or Receipted Bills from material men before payment will be made."

[4] Said instructions state *inter alia*: "General contractors, owners, *sub-contractors* or laborers, if and when required by the Association, must

as follows: *"THE UNDERSIGNED, each as an individual, does hereby acknowledge receipt in full of all moneys* and/or compensation of whatsoever nature *due him or to become due him* for any and all labor performed up to and including (DATE) [November 14th] 19[63] on or to the property or improvements thereon, or both, owned by [Robin Development Co.] and located at [20 Harder Road, Hayward, Calif.] also described as: LOT(s) [Portions of Parcels 1, 2 and 3] TRACT [Meek Soto] AND IN CONSIDERATION of such receipt, *does hereby release* SACRAMENTO SAVINGS & LOAN ASSOCIATION, the owner and the general contractor *from any and all liability,* either expressed or implied, and *does hereby release and waive any and all claims and/or rights of lien* which he now has or may have against the above described premises for material furnished thereon up to and including the above date." (Italics added.) The release form was completed by filling in the blank spaces in long-hand printing; material thus added to the form has been enclosed by us in brackets.

Immediately following are several lines with three columnar headings: "NAME (Actual Signature Required); TYPE OF MATERIALS FURNISHED; AMOUNT." On the release in question, the first column was left blank; in the second column was inserted "(12) Windows"; and in the third "$5,080.00," carried to the same total.

Just below the lines last mentioned is a double line extending across the entire page and immediately below it the language set forth in the footnote.[5] Following such language is a signature line for "Sub-CONTRACTOR" the prefix "Sub" being in much smaller lettering than "CONTRACTOR" and immediately beneath it a line designated "CONTRACTOR's License No."

---

submit this waiver *as a condition to the payment of moneys from any account."* (Italics added.)

[5] *"FOR THE PURPOSE of inducing* SACRAMENTO SAVINGS & LOAN ASSOCIATION *to issue a check in payment of the above total amount,* or as reimbursement of the prior payment thereof, the *undersigned contractor* and/or owner *certifies* that the *material furnished,* or both, herein before set forth *have actually been furnished* to the above described job premises *by the person or persons named* to the amount specified opposite the respective names, and *that unconditional payment for such materials has been made in full to date. Each* of the *undersigned warrants that the materials conform to specifications;* and that the *sum of money requested to be paid by this order for such materials is no greater than either the current market price or the reasonable value of such materials,* and that none of the undersigned has received, directly or indirectly, any commission, rebate, 'cut back,' or secret profits of any kind, by reason of the sale, purchase, or use of the materials." (Italics added.)

*without* the prefix "Sub." Plaintiff signed on the above signature line and presumably inserted its contractor's license number on the second line.[6] Across from the above lines is a separate signature line for "OWNER and/or General Contractor" on which Payne signed.

Ernest Ware, president of plaintiff, testified under cross-examination that he signed the material release in Payne's office so that Payne could in turn present it to Sacramento for the payment of Ware's obligation. The witness assumed this was the normal procedure "although I signed that to protect the people. They requested that I sign this to protect them for liens in consideration that I had been paid." He admitted that he knew when he signed it that Payne was going to present it to Sacramento "in order to induce payment." However, Mr. Ware did not furnish the information needed to fill out the form and the witness stated that the material release signed on behalf of plaintiff was actually filled out by one of Payne's employees *after* Mr. Ware signed it. Fairly read, Mr. Ware's testimony shows that he signed the form in blank.

On November 15, 1963 Sacramento issued a check to Payne in the sum of $12,780 in payment of the items set forth in the latter's payout voucher. However, no part of the $5,080 included therein and due plaintiff was ever paid to plaintiff by Payne.

On November 22, 1963 plaintiff submitted to Payne an invoice in the sum of $7,762.46, which was later adjusted to $7,362.42 at the trial. Receiving no payment from Payne, plaintiff, on January 22, 1964, filed with Sacramento its bonded stop notice pursuant to Code of Civil Procedure section 1190.1, subdivision (h), and on August 25, 1964 commenced the instant action. In its answer Sacramento denied all liability and in addition alleged as a separate defense that it had paid Payne the $5,080 at the request of plaintiff; that plaintiff had signed the material release for the purpose of inducing such payment; that had it not been for plaintiff's release, defendant would not have made the payment; and that as a result "plaintiff herein, at least to the extent of $5,080, is estopped to assert any claim against this defendant."

The trial court found favorably to plaintiff on all material issues, specifically finding that when "plaintiff executed the

---

[6]Such is concluded from the fact that the number inserted (204129) is not the number of the general contractor (211036) which appears on the payout voucher.

bottom portion of defendant's material release form, plaintiff had not been paid the sum of $5,080 and plaintiff did not represent that it had already received said sum of $5,080 by executing said material release form''; that at the time Payne presented the payout voucher to Sacramento, the latter knew plaintiff had not yet been paid said $5,080; and that Payne was Sacramento's ''agent for payment''; and concluding that plaintiff was not estopped to assert any part of its claim. Judgment for $7,362.42 was entered accordingly

Defendant's sole contention[7] before us is that the evidence establishes estoppel as a matter of law and that as a consequence it fails to support the findings and judgment to the extent of $5,080. Plaintiff's contrary position is that the perfecting of the stop notice created an unqualified right to payment which could not be defeated by a defense based upon the previous payment to the general contractor Payne. As plaintiff correctly points out to us, it is settled that where a bonded stop-notice claim is given pursuant to Code of Civil Procedure section 1190.1, subdivision (h), the statute requires that the fundholder ''must withhold from the borrower or other person to whom said owner may be obligated to make payments or advancements out of said fund sufficient money to answer such claim. . . .'' ''The fundholder must therefore withhold from funds furnished to pay construction costs or arising out of a construction loan sufficient money to answer bonded stop-notice claims regardless of the terms of its contract with the owner. . . . Subsection (h) requires that funds earmarked for construction purposes be used to pay suppliers of labor and materials who file claims under the subsection and therefore supersedes the private arrangements of borrower and lender.'' (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.* (1964) 61 Cal.2d 728, 734 [40 Cal.Rptr. 85, 394 P.2d 829]; *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan*

[7]In its briefs defendant, citing *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.* (1964) 61 Cal.2d 728 [40 Cal.Rptr. 85, 394 P.2d 829], also contended that Robin, the owner of the project was ''a necessary and indispensable party'' which the court should have ordered to appear. Apparently the point of the argument, which is presented in barely four lines excluding the cited case, is that because Robin was an *indispensable* party the judgment was void. Defendant's cited case does not hold that the owner is an indispensable party but only a necessary party and defendant has furnished us with no authority holding otherwise. Indeed at oral argument defendant's counsel with commendable candor. acknowledged that he could find no such authority and that the only arguable issue on appeal was that of estoppel. (See Code Civ. Proc., § 389, defining indispensable and conditionally necessary parties.)

*Assn.* (1963) 221 Cal.App.2d 705, 709-710 [34 Cal.Rptr. 644] ; *Miller* v. *Mountain View Sav. & Loan Assn.* (1965) 238 Cal. App.2d 644, 656 [48 Cal.Rptr. 278].)

However plaintiff has cited no authority to us, nor have we found any, holding that stop-notice claims are possessed of some singular property rendering them immune to the doctrine of estoppel and that the fundholder's obligation under the statute to withhold the claimed funds is of necessity an absolute one in every case regardless of the circumstances. Nor do statements in the cases to the effect that the statute is remedial and must be liberally construed in order to effectuate its objective of protecting mechanics and materialmen (*Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn., supra,* at p. 709 ; *H. O. Bragg Roofing, Inc.* v. *First-Federal Sav. & Loan Assn.* (1964) 226 Cal.App.2d 24, 27-28 [37 Cal.Rptr. 775] ; *Miller* v. *Mountain View Sav. & Loan Assn., supra,* at p. 655) warrant such conclusions. While we have found no cases involving the application of the doctrine of estoppel to stop-notice claims, there is ample authority declaring it applicable to mechanic's liens claimants. (*Washburn* v. *Kahler* (1892) 97 Cal. 58, 60 [31 P. 741] ; *J. & W. C. Shull* v. *Doerr* (1930) 110 Cal.App. 613, 615 [294 P. 464] ; *Jaekle* v. *Halton* (1938) 25 Cal.App.2d 706, 711-713 [78 P.2d 441] ; *Savage* v. *Nee* (1963) 212 Cal.App.2d 417, 420-421 [28 Cal.Rptr. 106] ; see generally 32 Cal.Jur.2d, pp. 751-752; 36 Am.Jur., Mechanics' Liens, §§ 221, 223, pp. 142-143; 57 C.J.S. Mechanics' Liens, pp. 803-805.) In our view, mechanic's lien claims are so closely analogous to stop-notice claims as to persuade us to the conclusion that the assertion of the latter claims is subject to the same principles and that a stop-notice claimant may be estopped to assert or enforce his claim if the circumstances of the particular case give rise to the doctrine. To this latter condition we now turn our attention.

Equitable estoppel or estoppel *in pais* has been defined as " 'a right arising from acts, admissions, or conduct which have induced a change of position in accordance with the real or apparent intention of the party against whom they are alleged.' (Bigelow on Estoppel, 4th ed., 445.) " (*Dolbeer* v. *Livingston* (1893) 100 Cal. 617, 621 [35 P. 328] ; *Pope* v. *J. K. Armsby Co.* (1896) 111 Cal. 159, 164 [43 P. 589].) It has been said (see *Dool* v. *First Nat. Bank of Calexico* (1930) 209 Cal. 717, 724 [290 P. 15]) that the doctrine of estoppel *in pais* is well stated in Code of Civil Procedure section 1962 subdivision 3 which provides : "Whenever a party has, by his own declara-

tion, act, or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such declaration, act, or omission, be permitted to falsify it.'' (To the same effect see *Scott* v. *Jackson* (1891) 89 Cal. 258, 263 [26 P. 898]; *Dolbeer* v. *Livingston, supra,* at pp. 621-622; *Wood* v. *Blaney* (1895) 107 Cal. 291, 295 [40 P. 428]; *Carpy* v. *Dowdell* (1897) 115 Cal. 677, 687 [47 P. 695]; *Nicholson* v. *Randall Banking Co.* (1900) 130 Cal. 533, 539 [62 P. 930].)

The doctrine ''proceeds wholly on the theory that the party to be estopped, has, by his declarations or conduct, misled another to his prejudice, so that it would be a fraud upon him to allow the true state of the facts to be proved.'' (*Martin* v. *Zellerbach* (1869) 38 Cal. 300, 314 [99 Am.Dec. 365]; *Parker* v. *Funk* (1921) 185 Cal. 347, 352 [197 P. 83]; *American Nat. Bank* v. *A. G. Sommerville, Inc.* (1923) 191 Cal. 364, 372 [216 P. 376]; *Dool* v. *First Nat. Bank of Calexico, supra.*) ''The foundation of equitable estoppel is justice and good conscience.'' (*Smith* v. *Anglo-California Trust Co.* (1928) 205 Cal. 496, 504 [271 P. 898].)

It is now well settled ''that the party relying upon the doctrine of equitable estoppel must prove the existence of the four required elements essential to its application: (1) that the party to be estopped must be apprised of the facts; (2) he must intend that his conduct will be acted upon, or act in such a manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon; (3) the party asserting the estoppel must be ignorant of the true state of the facts; and (4) he must rely upon the conduct to his injury. [Citations.]'' (*Crestline Mobile Homes Mfg. Co.* v. *Pacific Finance Corp.* (1960) 54 Cal.2d 773, 778 [8 Cal.Rptr. 448, 356 P.2d 192].)

The burden is upon the party asserting an estoppel to prove all the elements constituting it. (*General Motors Accept. Corp.* v. *Gandy* (1927) 200 Cal. 284, 295 [253 P. 137]; *Bear Creek Co.* v. *James* (1953) 115 Cal.App.2d 725, 732 [252 P.2d 723]; *Transport Clearings-Bay Area* v. *Simmonds* (1964) 226 Cal. App.2d 405, 427-428 [38 Cal.Rptr. 116].) The existence of an estoppel *in pais* is a question of fact (*General Motors Accept. Corp.* v. *Gandy, supra; Cruise* v. *City & County of San Francisco* (1951) 101 Cal.App.2d 558, 562 [225 P.2d 988]; *Safway Steel Products, Inc.* v. *Lefever* (1953) 117 Cal.App.2d 489, 491 [256 P.2d 32]) unless the facts are undisputed and

susceptible of only one inference in which event it is a question of law. (*California Cigarette Concessions, Inc. v. City of Los Angeles* (1960) 53 Cal.2d 865, 868 [350 P.2d 715]; *Sawyer* v. *City of San Diego* (1956) 138 Cal.App.2d 652, 662 [292 P.2d 233].) Thus the trial court's findings and conclusion that an estoppel did not exist in the instant case will be conclusive on appeal unless the opposite conclusion is the only one reasonably deducible from the facts. (*Pacific Gas etc. Co.* v. *State Board of Equalization* (1955) 134 Cal.App.2d 149, 156 [285 P.2d 305]; *People* v. *Watkins* (1959) 175 Cal.App.2d 182, 185 [345 P.2d 960].)

We proceed to determine whether all of the above elements of estoppel are present as a matter of law in the instant case. In so doing we disregard conflicting evidence on behalf of Sacramento and indulge in every legitimate inference which may be drawn from the evidence in favor of Ware. As to the *first* element it is apparent that Ware, the party to be estopped, was according to its own testimony apprised of the facts. It knew that it had not been paid for the windows by Payne or Robin and that the entire amount of $5,080 was due.

Turning to the *second* element of the doctrine we consider the *conduct* of Ware and inquire whether Ware *intended such conduct to be acted upon* by Sacramento. The uncontradicted evidence in the case demonstrates that Ware directed and requested Sacramento to pay directly to Payne, the general contractor, the $5,080 for the windows furnished by Ware. Implicit in this direction is Ware's intention that it be acted on. As we have set forth, Mr. Ware himself admitted that he signed the material release so that Payne could in turn present it to Sacramento for the payment of the amount owing to Ware and that he knew that the release was going to be used to induce such payment.

To escape this result, plaintiff argues that the material release was "in effect two forms"; that plaintiff did not sign the top part which, as the argument goes, is the "Waiver of Mechanic's Lien Rights" and therefore did not represent according to that part that he had received payment for the item involved; that it signed merely the bottom part of the form which, as the argument goes, is the "Certificate to Produce Payment";[8] and that by so doing plaintiff did not represent

---

[8]Plaintiff's theory is that the double line divides the document into two parts. Plaintiff therefore makes a similar division of the caption of

in such bottom part that it had received payment but merely that the materials had been supplied. Such dichotomy, however, does not rescue plaintiff. It is not necessary in the instant case to ground the estoppel on plaintiff's representation that he had received payment of the $5,080. The estoppel here arises out of plaintiff's authorization of the payment of his bill to the general contractor; it rests upon plaintiff's representation to Sacramento that plaintiff would look to Payne rather than to Sacramento for the eventual receipt of its money.

Is the *third* element of the doctrine present? Was Sacramento, the party asserting the estoppel, ignorant of the true state of the facts? The true state of the facts with which we are here concerned does not consist of the circumstance that plaintiff had not received payment since, as we have explained, that was not fundamental to the estoppel but consists of the circumstance that the general contractor would not, or did not intend to, pay plaintiff from the funds received. The payout voucher[9] shows that the general contractor expressly agreed "that the check, or its proceeds, in payment for the above described materials and/or labor, is received IN TRUST AND AS BAILEE for the sole and express purpose of paying all costs and charges for labor and/or materials described in this non-negotiable order, . . ." Neither this document nor any other evidence in the case is susceptible of the inference that Sacramento knew that such payment would not be made. On the contrary Sacramento could properly assume that the general contractor would faithfully perform his duties under the trust. (Code Civ. Proc., § 1963, subds. 1, 19, 20.)

Finally, as to the *fourth* element of estoppel, it is manifest from the testimony of plaintiff and the pertinent documentary evidence summarized by us that Sacramento relied on Ware's conduct to its injury. Plaintiff executed the material release so that Payne could present it and secure payment; the release was a condition precedent to such payment; upon its presentation, Sacramento made the payment out of the loan proceeds to the general contractor. It is obvious that in so doing it relied upon plaintiff's representation that payment of its obligation could be made to Payne.

---

the document which appears only at the top. There is no separate caption or heading for the bottom part of the document. (See our detailed description *supra*.)

[9] Defendant's Exhibit A which was received in evidence by consent of counsel for the parties after a discussion with the trial judge in chambers.

As we have explained, only one conclusion can be drawn from the evidence in the instant case, namely that as the result of plaintiff's conduct in authorizing payment of the loan funds to the general contractor and in effect representing that it would look to Payne, plaintiff cannot now "be permitted to falsify it." (Code Civ. Proc., § 1962, subd. 3 and other authorities cited therewith, *supra*.) The instant case falls within the following rule applicable to the analogous situations of mechanics' liens: "A subcontractor, materialman, or laborer is estopped to assert a lien where the owner has settled with the contractor, or made payments to the contractor or other subcontractors, *in reliance on* the subcontractor's, materialman's, or laborer's receipt for the amount due him, his statement that he has been paid by the contractor, *his representation that he will not look to the owner for payment of work performed or materials furnished, or his direction, authorization, or expressed desire that payment be made to the contractor.* The estoppel created by the foregoing matters is coextensive with the amount of money paid by the owner in reliance thereon, . . ." (Italics added.) (57 C.J.S., Mechanics' Liens, § 230, pp. 804, 805.) We conclude that plaintiff was estopped as a matter of law to assert or enforce its bonded stop-notice claim to the extent of $5,080.

In an attempt to impose on Sacramento a responsibility for its loss, Ware argues that Sacramento "made no effort to see that subcontractors actually received payment," that instead it "simply relied upon Payne to fulfill this duty," and that as a consequence "Payne was to act as agent to see that subcontractors were paid." As previously noted, the trial court found that Payne was Sacramento's "agent for payment." However, there is no basis in the record for either the argument or the finding. Ware does not and cannot point to any evidence in the record establishing the duty which it ascribes to Sacramento. As defendant properly argues, no privity of contract existed between Ware and Sacramento on which such a duty could be predicated. The building loan agreement was between Sacramento on the one hand and Robin and Payne on the other, not between Sacramento and Ware. The contract for the windows was between Payne and Ware and not Sacramento and Ware and any liability for payment rested on Payne. Ware could not sue Sacramento or even Robin for them.

The crucial relationship was between Ware and Payne, not Ware and Sacramento. It was Payne, not Sacramento, which

owed the money to Ware. It was pursuant to the building loan agreement, to which Ware was not a party, that the loan disbursement order was presented by Payne to Sacramento. (See fn. 1, *ante.*) Nowhere in such agreement does it appear that Payne is an agent of Sacramento. Indeed, disbursement was made to Payne pursuant to the provisions of the agreement, as the general contractor of Robin and therefore as one of the contracting parties and not as an agent of Sacramento. As defendant correctly points out, when Payne presented the payout voucher to Sacramento it was on his own behalf and to obtain monies to pay *his own* obligations which he had contracted, not on behalf of Sacramento or to pay as agent for the latter. If Payne was an agent for anyone it was for Ware which authorized Payne to obtain the payment for it.

The judgment is modified by deducting therefrom the sum of $5,080 and as thus modified is affirmed. Appellant shall recover costs on appeal.

Molinari, J., and Sims, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 25, 1967. Sullivan, J., did not participate therein.