[Civ. No. 31088. First Dist., Div. Four. Apr. 26, 1973.]

E. D. McGILLICUDDY CONSTRUCTION CO., INC.,
Plaintiff, Cross-defendant and Appellant, v.
KNOLL RECREATION ASSOCIATION, INC.,
Defendant and Appellant;
CROCKER-CITIZENS NATIONAL BANK,
Defendant, Cross-complainant and Appellant.

892

COUNSEL

Bancroft, Avery & McAlister and Robert L. Dunn for Plaintiff, Cross-defendant and Appellant.

Burd, Hunt & Friedman, John J. Bartko, Tobin & Tobin, John L. Hosack, Landels, Ripley & Diamond and Edgar B. Washburn for Defendant, Cross-complainant and Appellant and for Defendant and Appellant.

OPINION

DEVINE, P. J.—Plaintiff, E. D. McGillicuddy Construction Co., Inc., appeals from a judgment which denies to plaintiff foreclosure' of its mechanic's lien against certain units of a condominium project, and which not only denies plaintiff a personal judgment against Crocker-Citizens National Bank but awards money judgment in favor of the bank against plaintiff·as a cross-defendant. The court declared that the lien was a valid one, but that it had been waived or that plaintiff is estopped from having it enforced. Defendants Crocker-Citizens National Bank (hereafter Crocker) and Knoll Recreation Association, Inc. (hereafter KRA) appeal from that portion of the judgment which declares plaintiff's lien to be valid.

### Facts

On March 25, 1965, plaintiff agreed to construct a complex of 30 condominium units for D. M. Christensen Construction Co., Inc. (hereafter Christensen), owner and developer of a project called "The Knoll," in San Rafael. Plaintiff was to receive costs plus 7 percent, plus an overhead allowance of $7,500, payments on account to be made in the amount of $1,800 as each unit was sold. Six buildings or "blocks" were to be constructed, each block to be a self-sufficient integer. Units within each block had one continuous roof. A buyer would receive a fee interest in the air space and interior walls of his unit plus an individual interest in Parcel A, the "common area," which included the whole space of the project (other than individual air space and walls), part of which was a recreational area. Membership in a club, KRA, came with the purchase.

The trial court found that the project was a single work of improvement

and that no portion of the project could be regarded complete until all work on the project was finished.

McGillicuddy entered into performance of the work on May 5, 1965. On May 7, 1965, a deed of trust from Christensen to Crocker was recorded securing the former's obligations to the latter in the amount of $924,990. The property subject to the deed of trust was described as Lot 1, which was the residential portion of the project upon which condominium units were to be constructed. On the same date, Christensen conveyed Parcel A by grant deed to KRA.

Construction was financed by Crocker's loan to Christensen, which was funded by progress payments made upon requests by Christensen which were geared to stages of completion of individual units on a schedule determined by Crocker and Christensen. Construction continued during 1965 and 1966. Eleven units were sold during the course of construction, and McGillicuddy received $1,800 from each closing towards its fee, as provided by the construction contract.

It became apparent in 1965 that the loan funds would be inadequate to finance the project. Nevertheless, McGillicuddy completed the work on the project on February 16, 1966. Christensen filed notices of completion on all but two of the thirty units. No notice of completion was filed on the entire project. However, there is no dispute as to McGillicuddy's complete performance of the work. Claim of lien and amended claims were filed which covered the entire project. On the date of the filing of the second amended claim, May 6, 1966, there was due to McGillicuddy the amount of $126,161.63, an amount later reduced to $122,561.63.

On July 8, 1966, plaintiff commenced a foreclosure action. On December 8, 1966, McGillicuddy, Christensen, KRA, Crocker and certain title insurance companies made an agreement, for the purpose of having an orderly sale of the remaining units, that plaintiff's action would be held in abeyance; but they agreed that the stay might be terminated at will. Crocker commenced foreclosure of its deed of trust on August 21, 1967. This constituted termination of the stay, according to its provisions, so plaintiff called for a pleading to its complaint. The bank answered, alleging that plaintiff had been fully paid, and further asserting the superiority of its lien over any lien which plaintiff might have.

### Timeliness of Filing of Claim of Lien

It is convenient to discuss first the simpler of the two appeals, that

of defendants as cross-appellants. This appeal is from that portion of the judgment which declares that plaintiff's mechanic's lien is valid and prior to the interests of defendants in Lot 1 and Parcel A. Although the court made further conclusions against plaintiff in respect of waiver and estoppel, as described under the next heading, conclusions which defendants as respondents essay to sustain, defendants at this point assert that the purported lien is of no validity because notice was not timely filed.

The court found 1) that plaintiff fully performed the obligations of the construction contract and completed construction of the project on March 14, 1966, the last work on the buildings themselves being done on February 16, 1966; 2) that plaintiff recorded its claim of lien on April 11, 1966, an amended claim on April 12, 1966, and a second amended claim on May 6, 1966; 3) that the parties consistently treated the construction project as a single development; that it would have been impossible to apportion particular costs to particular units; and that there is no specific amount due plaintiff under the construction contract for the construction of any one unit.

If the finding be sustained that the work was completed on March 14, 1966 (it being conceded that no notice of completion of the entire project was filed), the recording, even of the second amended claim, was within 90 days and was timely. (Civ. Code, § 3115, former Code Civ. Proc., § 1193.1, subd. (a).) But defendants contend that the work was completed earlier. The problem must be considered somewhat separately as to the individual residential units and to the common use development.

a) *The residential units.* A notice of completion was filed by Christensen upon the finishing of construction of each of the thirty units, except two (the reason for the omission in the two cases was unknown). The determination of the date of completion of a work of improvement is a question of fact. (*Scott, Blake & Wynne* v. *Summit Ridge Estates, Inc.,* 251 Cal. App.2d 347, 357 [59 Cal.Rptr. 587].) Defendants make no serious assault on the finding, but merely say that "there were separate individual residential units." Without a specific showing of how the evidence fails to support a finding, this is not an assignment of error. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 425, pp. 4391-4392.)

The filing of the notices of completion of individual units, in a case where the contract was for an integrated complex and the entire work was far from completion, is premature and of no effect. (*Scott, Blake & Wynne* v. *Summit Ridge Estates, supra,* at p. 357.)

b) *The common area.* Defendant and cross-appellant, Knoll Recreation Association, is a nonprofit corporation whose shareholders are the owners of the condominium units. Parcel A of the project was to contain a swimming pool, a sauna bath, a putting green, a meeting room, and landscaping. When plaintiff made his contract with Christensen, Christensen owned Parcel A. There was no apportionment of amount to be paid for work on Parcel A. Later, Christensen deeded Parcel A to KRA. The date when the work on Parcel A proper was completed is in dispute. Christensen testified that it was in early July 1965; McGillicuddy testified that work was done on the recreation area as late as March 14, 1966. KRA filed a notice of completion on July 12, 1965. The court did not decide what was the date when work on Parcel A, if it were a separate unit, was completed, but, as said above, found that the parties regarded the project to be a single one, the completion date for the whole being March 14, 1966. That there is substantial evidence to support this finding appears from the singleness of the construction contract, which provides for no apportionment, and from the integration of the recreational and community aspects of the project with the residential units.

Section 1193.1, subdivision (j), of the Code of Civil Procedure (now Civ. Code, § 3084) requires the contractor to state his demand after deducting credits and offsets. No allocation had been provided by the contract for payment upon physical completion of any one unit or of Parcel A. The court found that it would have been impossible to apportion particular costs to particular units.

Plaintiff asserted its lien within the time limits "after the completion of his contract," as specified in Code of Civil Procedure section 1193.1, subdivision (a) (now Civ. Code, § 3115). KRA argues that the part of Code of Civil Procedure section 1195.1 (which is now Civ. Code, § 3131) sets the commencement of running of time for filing a claim of lien as the date of completion of "each residential unit." The question whether this section applies to condominiums apparently has not been decided. The section plainly covers tract or row houses, in its reference to "separate residential units." But each structure in our case had a single roof. The court expressly found that the interior walls, to which an individual buyer would have title, would not be adequate exterior walls. We support the court's "single project" conclusion. The words "separate residential units," as they appear in section 3131 of the Civil Code do not fit units which are not self-contained, but merely areas within walls and under a roof not owned by the residents. But if there were doubt about the meaning, it should be resolved in favor of the lien claimant, first, because of the

policy to construe the mechanic's lien law with a view to effect its objects and to promote justice (*Hendrickson* v. *Bertelson*, 1 Cal.2d 430, 432-433 [35 P.2d 318]; *B. & J. Constr. Co.* v. *Spacious Homes, Inc.*, 204 Cal.App. 2d 216, 222 [22 Cal.Rptr. 41]); and second, because to require a separate lien procedure on each unit would result in a multiplicity of potential lawsuits, a result to be avoided if possible (*Schulte* v. *Euben*, 215 Cal. 172, 174 [8 P.2d 843, 81 A.L.R. 764]).

The claim was timely filed; the lien is valid, and the work having been commenced before the construction loan was made, as was known to the bank, the lien is prior to that of the deed of trust.

### *Waiver or Estoppel*

██ Having concluded that plaintiff's lien was valid, the court decided that on principles of waiver or estoppel, or both, plaintiff had relinquished or was prevented from asserting its otherwise subsisting lien in the full amount as to units of the condominium which were sold subsequent to the contract of December 8, 1966.

Following plaintiff's commencement of foreclosure, this contract was executed by McGillicuddy, Christensen, Crocker, KRA, and Transamerica Title Insurance Company. It provided that there would be a moratorium on the foreclosure proceedings, that Christensen would use its best efforts at its expense to sell the remaining units, and that in the event judgment in the foreclosure action should establish priority of the bank's lien over that of McGillicuddy, McGillicuddy shall pay Crocker a certain amount (the calculation of which is unimportant because Crocker did not win its point), but that if judgment were rendered establishing priority of McGillicuddy's lien over that of Crocker, Crocker must pay McGillicuddy the amount of the latter's lien or claim less any payments theretofore made, plus interest and costs, whereupon McGillicuddy shall execute a release of lien as to all of the property.

The bank later commenced foreclosure under its deed of trust and, by the terms of the contract, this terminated McGillicuddy's obligation to refrain from going ahead with its own foreclosure.

The theory upon which the court denied recovery to plaintiff despite

the court's finding of an existing and prior lien and despite Crocker's express agreement to pay the amount of plaintiff's claim if such priority should be established by judgment, is set forth not only in formal conclusions of law but more fully in a memorandum opinion. It may be stated briefly thus: From a strictly legal standpoint plaintiff did have a valid lien on the whole property as of the date of its filing following completion. But if, immediately prior to the December 8 agreement, plaintiff had sought to enforce its lien, a court of equity would not have permitted plaintiff to enforce its lien against any units which had theretofore been sold, because these units had been sold and title policy endorsements had been issued to the purchasers, with knowledge and participation by the plaintiff, and plaintiff had shared in the proceeds of the sales. The purchasers, the bank, and the title company were entitled to assume that plaintiff was not asserting lien rights to that portion of the property. But immediately prior to the December 8, 1966, agreement, plaintiff did have a valid lien which could be enforced against the 17 units then remaining unsold. Plaintiff could not, however, because of the circumstances just described, have enforced its lien in the full amount against the unsold 17 units; wherefore, plaintiff is entitled to the ratio of the unsold units to the total units, or 17/30ths of the unpaid balance. Seventeen-thirtieths of $122,561.63 is $69,451.59. Since plaintiff had in fact received $75,604.90 from the "sales program," it was held that plaintiff had received $6,153.31 more than it was entitled to, and Crocker was entitled to judgment in this amount on its cross-complaint.

We cannot agree with the court's conclusion. If plaintiff had a valid lien which matured only on the completion of the whole project, as the court decided it did, and if it was impossible, as the court decided it was, to allocate the amounts due for costs of construction of individual units, including Parcel A, then plaintiff could not legally foreclose upon its lien until the project was completed. The court remarked upon the lack of statutory procedure in the matter of application of mechanic's lien laws to condominium units, and then, although holding that Civil Code section 1357 does not apply (this section protects condominium owners from liens for repairs to other units), held that the last sentence of that section is consistent with the theory of apportionment which the court was about to apply. This sentence is designed to protect condominium owners from liens in cases of emergency repairs or services and materials furnished for common areas which produce liens on the whole property.

The sentence referred to reads as follows: "The owner of any condominium may remove his condominium from a lien against two or more condominiums or any part thereof by payment to the holder of the lien of the fraction of the total sum secured by such lien which is attributable to his condominium." (Civ. Code, § 1357.) As the court said, it was not using the section except by analogy. But section 1357 applies only to services performed at the request of a condominium owner as distinguished from the builder of the whole project, and the removal of the lien is to be by payment of the fraction of the total sum secured by the lien which is attributable to his condominium. But there is no statutory standard for fractioning a contractor's lien according to sold and unsold units. Defendants make no reference to section 1357 in their brief on appeal. We are of the opinion that the court may not virtually construct another statute in the field of mechanic's lien law by reference to another statute which covers a different situation, even by use of its powers of equity. The mechanic's lien law being designed for the protection of suppliers, suppliers, in order to enjoy its protection, must be able to follow statutes enacted by the Legislature and not be required to anticipate the virtual creation of a statute by the courts.

But even considering the equitable powers of the court, we observe that the parties most deserving of protection, that is, the purchasers of the condominiums, are not helped by the decision. Each of the buyers of the 13 units had received a title insurance policy endorsement. In some other case, perhaps condominium owners will have a continuing interest and may be able to set forth facts sufficient to create estoppel against the builder. But what is before us is a single case in which the conflicting interests do not include the purchasers.

The waiver or estoppel to which the court made reference has to do with sales made prior to the December 8, 1966, agreement, for the court made its conclusion of law that plaintiff's rights are not affected by action taken after execution of that agreement. The court further made the conclusion of law that the notices of completion do not preclude plaintiff's foreclosing its lien on the units which have been sold. This of course is consistent with the decision that the project must be taken as a whole. What caused the waiver and/or estoppel, as expressed by the judge, was "plaintiff's knowingly permitting the sales to go forward and sharing in the proceeds." Defendants make almost no attempt to justify the result as the product of a waiver. ■ Waiver is the intentional relinquishment of a known right. It cannot be established without clear showing of intent to

give up such right. (*Xum Speegle, Inc.* v. *Fields,* 216 Cal.App.2d 546, 555 [31 Cal.Rptr. 104]; *Church* v. *Public Utilities Com.,* 51 Cal.2d 399, 401 [333 P.2d 321].) In addition, a waiver will not be implied contrary to the intention of the party whose rights would be injuriously affected unless by his conduct the opposite party was misled, to his prejudice, into the honest belief that such waiver was intended. (*Xum Speegle, Inc.* v. *Fields, supra,* at p. 555.) ▮ There is no testimony or other evidence that plaintiff intended to waive its lien or that any of the parties respondent was led into an honest belief that waiver was intended because of McGillicuddy's conduct. It is hard to imagine that any interested party would believe that the contractor would deliberately waive his lien, which could only be asserted later, by accepting periodic advances on his "fee" when one considers in relation to this modest amount the large outlay for labor and materials. (Indeed, it is doubtful that waiver was pleaded, but we need not discuss this point because of the complete lack of evidence on the subject.)

Defendants assert that estoppel resulted from the facts 1) that plaintiff never informed either the construction lender or the title insurer that it intended to assert liens against units upon which sales had closed and 2) that if it had done so, lien waivers would have been required before making the final construction loan payment or facilitating a sale through the issuance of a new title insurance policy. But this assertion fails in both of its parts. As to the first, plaintiff was under no obligation to tell defendants that it expected that in case of difficulty (which was not anticipated at the time the units were sold) it would take advantage of the right accorded to suppliers under the mechanic's lien laws. ▮ Mere silence will not create estoppel unless the silent party was under some obligation to speak, and a party invoking such estoppel must show that it was the duty of the other to speak, that he has been induced to act by reason of the silence, and that the silent party had reasonable cause to believe that he would so act. (*Newhall* v. *Hatch,* 134 Cal. 269, 274 [66 P. 266]; *Transport Clearings-Bay Area* v. *Simmonds,* 226 Cal.App.2d 405, 427 [38 Cal.Rptr. 116].) In *Schrader Iron Works, Inc.* v. *Lee,* 26 Cal.App.3d 621 [103 Cal.Rptr. 106], it was held that no estoppel arose by conduct from the fact that the lien claimant withheld the filing of his claim until the end of the statutory period in order to assist the owner in his sale of the property. He merely had exercised a right given to him by statute. In the *Schrader* case, as in the present one, all the facts were known to the parties. As to the second of the elements, there is no evidence that the bank, under its

contract with Christensen, would or could have withheld payments to Christensen unless plaintiff would give lien waivers. Defendants simply did not appreciate the fact that in case of failure to make payments, plaintiff had the right to assert its lien upon completion of the work. This lack of appreciation cannot be charged to plaintiff.

But what completely destroys the estoppel theory is the finding of the court that there is no evidence of any deception or conduct intended to mislead on the part of plaintiff (or of any other party). In all of the cases cited by defendants, wherein mechanic's lien claimants have been estopped to assert their liens, there has been an element of deception or misleading conduct. In *A. A. Baxter Corp.* v. *Home Owners & Lenders,* 7 Cal.App.3d 725 [86 Cal.Rptr. 854], the president and sole stockholder of plaintiff corporation, the lien claimant, had an interest in the partnership which owned the property on which the work was done. He caused the lien to be withheld in order to preserve the financial integrity of the owner, to the disadvantage of purchasers of homes within the tract, an obvious double dealing. In *Jaekle* v. *Halton,* 25 Cal.App.2d 706 [78 P.2d 441], the lien claimants falsely acknowledged by receipted bills that they had been paid in full, as a result of which the owners paid the prime contractor. In *R. D. Reeder Lathing Co.* v. *Allen,* 66 Cal.2d 373 [57 Cal.Rptr. 841, 425 P.2d 785], plaintiff, according to affidavits for this was a summary judgment case, had extended credit to a company which was in financial difficulty in exchange for that company's contracting of its lathing work to plaintiff, and had been guilty of other conduct which was referred to by the court as "setting the trap for defendant" (p. 379). In *Ware Supply Co.* v. *Sacramento Savings & L. Assn.,* 246 Cal.App.2d 398 [54 Cal.Rptr. 674], plaintiff materialman had executed a release so that the general contractor could present it and secure payment. In *J. & W. C. Shull* v. *Doerr,* 110 Cal.App. 613, 616 [294 P. 464], plaintiff had issued a false receipt. There is no evidence of misconduct on the part of plaintiff in the case at bench, and the court has found accordingly.

The judgment declaring the plaintiff's mechanic's lien to be valid and prior to the interests of defendants, and finding the balance due plaintiff to be $122,561.63 is affirmed. The judgment is reversed in so far as it declares estoppel or waiver of the lien, denies recovery to plaintiff, and awards money judgment to Crocker. The case is remanded to the trial court with directions to enter judgment accordingly, giving credit to defendants for any amounts paid on said sum and awarding interest to plaintiff on the unpaid balance. The judgment shall be rendered against Crocker-

Citizens National Bank under the agreement of December 8, 1966. Plaintiff-appellant is awarded costs on appeal.

Bray, J.,* and Good, J.,† concurred.

The petition of appellant Crocker-Citizens National Bank for a hearing by the Supreme Court was denied June 28, 1973.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

†Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.