[Civ. No. 43171. First Dist., Div. One. Aug. 28, 1979.]

JOSEPH CHAPLIS, Plaintiff and Appellant, v.
COUNTY OF MONTEREY et al., Defendants and Respondents.

**COUNSEL**

Howard S. Burnside and Walter Searle for Plaintiff and Appellant.

William H. Stoffers, County Counsel, Jose Rafael Ramos, Deputy County Counsel, Brian Finegan, Hoge, Fenton, Jones & Appel and Ronald F. Scholl for Defendants and Respondents.

## Opinion

MARTIN, J.*—Joseph Chaplis appeals from a judgment of nonsuit and dismissal of all his alleged causes of action against all defendants. For the reasons hereinafter stated, we affirm the judgment as to the County of Monterey and its employees and reverse the judgment as to defendants Heisinger and Bonanfant.

In the fall of 1973, Mr. Chaplis decided, after numerous hours of investigation and study, to establish a laundromat in Carmel Valley, County of Monterey. He purchased a lot with an old gasoline station on it, intending to convert the service station building into a laundromat. When that did not prove feasible he demolished the service station and decided to construct a new building on the lot which would be used in part for a laundromat and other offices or shops. Chaplis retained James Heisinger, a licensed building designer, to design the building and prepare the plans and specifications needed to obtain the necessary building permit. Chaplis retained Robert J. Bonanfant, a general contractor, to construct the building. Chaplis relied on Heisinger and Bonanfant to obtain the necessary permits. Chaplis did not know, and apparently took no steps to ascertain, that a county zoning ordinance required a land use permit for operation of a laundromat in Carmel Valley.

Chaplis knew he had to obtain a septic tank permit and therefore hired an engineering firm to conduct the necessary tests and prepare the data necessary for application of a septic tank permit. The engineering firm prepared the specifications and designed the septic tank and Heisinger incorporated that design into the drawings prepared by him. Heisinger had no further responsibility for obtaining the septic tank permit.

When Heisinger had completed the plans he gave sets of the plans to Mr. Bonanfant, the contractor, who presented them to the county building department on January 23, 1974, and applied for a building permit. Jules Goetz, senior building inspector, assisted Mr. Bonanfant in filling out the application for a building permit. Before it could be issued, however, the plans had to be checked for compliance with the building code, and the building design and landscaping had to be approved by a local advisory committee in Carmel Valley and the county planning commission.

---

*Assigned by the Chairperson of the Judicial Council.

In February 1974 a number of minor changes were made in the plans to comply with building code requirements. Barbara Maves, principal clerk in the building inspector's office, maintained that in late February she informed Chaplis, Heisinger, and Bonanfant that a land use permit was necessary for operation of a laundromat, but Chaplis, Heisinger, and Bonanfant denied Ms. Maves had so informed them of that fact.

Meanwhile, on February 28, 1974, Frank Hebert, a district sanitarian for the county division of environmental health, issued a septic tank permit to Chaplis. The county concedes that the septic tank permit was prematurely issued in light of Monterey County Ordinance No. 1836, section 4(e), which provides in substance that a septic tank permit shall not be issued before the applicant has obtained the approval of his proposed land use from the appropriate zoning authority of the county.

On March 11, 1974, Bonanfant commenced preliminary construction work consisting of grading, digging trenches, and building of forms for the foundation. This work was commenced before the building permit was issued.

On March 13, 1974, the county planning commission held a hearing to consider the building design and related matters such as landscaping and parking facilities. Mr. Heisinger attended that meeting on behalf of Mr. Chaplis. At that meeting, Mr. Robert Slimmon, Jr., zoning administrator for the County of Monterey, told Mr. Heisinger that a laundromat could not be operated in the proposed building without first obtaining a use permit. The application for a land use permit had to be submitted to Mr. Slimmon, as zoning administrator. Heisinger maintained that this was the first he knew that a use permit was required for operation of a laundromat in the building Chaplis planned to construct.

Heisinger testified that he informed Chaplis on or about March 14, that he had to obtain a use permit to operate a laundromat in the proposed building; that Chaplis told him to obtain the use permit; and that an application for a use permit was filed on March 15. Chaplis, however, testified that he did not learn of the need for a use permit from Heisinger until late March or early April when Heisinger billed him for the use permit fee.

In any event, on or about March 14, Mr. Slimmon, the zoning administrator, advised the building department that a building permit could be issued to Chaplis for construction of the proposed building to be

used for offices or shops but not for a laundromat. The next day, March 15, the building permit was issued to Bonanfant, the contractor, as agent for Chaplis. As issued, the word "laundromat" was crossed out. There was a dispute whether the fourth copy, which was posted at the building site, was legible. Bonanfant's testimony indicates he paid little, if any, attention to the fact the word "laundromat" had been crossed out on the building permit, and apparently Bonanfant did not inform Chaplis of that fact.

On March 15, the same day the building permit was issued, a building inspector went to the site and inspected the foundation forms. Subcontractors performed plumbing and electrical work, and on March 18, concrete was poured for the foundation.

On April 3, 1974, Chaplis was informed by letter from Frank Hebert, of the division of environmental health, that the septic tank permit for his building was issued contrary to the provisions of Monterey County Ordinance No. 1836, which required approval of the proposed land use before issuing a septic tank permit. Mr. Hebert's letter stated that the permit "is hereby held in abeyance pending resolution of land use application," and it recommended suspension of construction.

On April 5, 1974, Mr. Walter Wong, director of environmental health, wrote a letter to Mr. Chaplis stating that after reviewing the engineering report submitted with the application for the septic tank for the proposed laundromat, the health department would recommend to the planning commission that application for use of the building for a laundry be denied. Mr. Wong explained that the engineering report did not accurately show the volume of waste water which would be produced by the laundry, and that the lot was too small for an adequate septic tank. The septic tank permit issued to Mr. Chaplis was declared void. There is no evidence that Chaplis had proceeded with construction of the septic tank before the permit was revoked.

On April 11, Mr. Slimmon, the zoning administrator, denied Chaplis' application for a use permit for the proposed laundry on the ground a septic tank permit could not be issued for that proposed use. Chaplis retained an attorney to appeal that decision to the Monterey County Board of Supervisors, and on May 21 the supervisors upheld Mr. Slimmon's decision and denied Chaplis a use permit.

Chaplis decided not to pursue his legal remedies further. He decided to proceed with construction of the building and use it for other

purposes. On May 31, a new septic tank permit was issued for a new use of the building without the laundromat. The building was substantially completed in July 1974. Final completion occurred on September 15, 1974.

I

In January 1975 Chaplis filed a complaint for damages against the County of Monterey and its employees, Frank Hebert and Walter Wong, for alleged negligence in issuing and revoking the septic tank permit before the proposed use of the property for a laundry could be approved by the zoning administrator. Chaplis also named Robert Slimmon, zoning administrator, as defendant for alleged negligence in denying Chaplis' application for a use permit. Chaplis sought damages for certain expenses and losses incurred in constructing the building to house a laundromat, plus alleged loss of income.

The trial court granted the county's motion for a judgment of nonsuit on the ground the county and its employees were immune from liability under sections 818.4 and 821.2 of the Government Code.[1] These statutes render a public entity and its employees immune from liability for injury caused by discretionary acts in issuing, revoking, suspending, or denying permits or licenses and the like. ■ Appellant recognizes that in this case the initial decision by the county employees to issue a septic tank permit was a discretionary act within the immunity statutes; however, appellant argues that the act of issuing the septic tank permit before the zoning administrator had approved use of the land for a laundromat, as required by Monterey County Ordinance No. 1836, constituted a negligent ministerial or nondiscretionary act in violation of a mandatory duty for which the county and its employees could be held liable (see *Morris v. County of Marin* (1977) 18 Cal.3d 901 [136 Cal.Rptr. 251, 559 P.2d 606]; *McCorkle v. City of Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453]; *Elson v. Public Utilities Commission* (1975)

---

[1]Section 818.4 provides: "A public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or an employee of the public entity is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked."

Section 821.2 provides: "A public employee is not liable for an injury caused by his issuance, denial, suspension or revocation of, or by his failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where he is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked."

51 Cal.App.3d 577 [124 Cal.Rptr. 305]; *Mann v. State of California* (1977) 70 Cal.App.3d 773 [139 Cal.Rptr. 82]; *Young v. City of Inglewood* (1979) 92 Cal.App.3d 437 [154 Cal.Rptr. 724]).

Government Code section 815.6 provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." The liability imposed under that statute takes precedence over the immunity provisions of Government Code section 818.4, that is, immunity for discretionary acts as distinguished from ministerial or nondiscretionary acts (*Morris v. County of Marin, supra,* 18 Cal.3d 901; see *Slagle Constr. Co. v. County of Contra Costa* (1977) 67 Cal.App.3d 559 [136 Cal.Rptr. 748]; cf., *O'Hagan v. Board of Zoning Adjustment* (1974) 38 Cal.App.3d 722 [113 Cal.Rptr. 501]).

In the instant case, however, appellant failed to establish the liability of the county under section 815.6 of the Government Code, as applied in *Morris v. County of Marin, supra,* 18 Cal.3d 901, and similar cases. Although the Monterey County Health Department was under the duty not to issue the septic tank permit before the zoning administrator approved use of the property for a laundromat, that duty was· not designed to protect appellant against the injury or losses allegedly sustained by him. Nor was the alleged breach of that duty the proximate cause of his injury or losses. Appellant did not allege nor did he prove any damages sustained in constructing the septic tank in reliance on the septic tank permit. Rather, the thrust of his entire complaint and evidence was that from issuance of the septic tank permit he assumed he could construct the building for a laundromat, and that his damages were sustained in construction of the building, not the installation of the septic tank (which was ultimately installed pursuant to a valid permit after the laundromat was abandoned).

Appellant's alleged damages were sustained as a result of proceeding with construction of the building before he obtained the building permit. Appellant failed to prove negligence on the part of the county in issuing the building permit which authorized construction of the building as designed but not for use as a laundromat. Heisinger and Bonanfant knew, or through the exercise of reasonable care should have known, that the building permit did not approve use of the building for a laundromat.

Any alleged failure by Heisinger and Bonanfant to communicate that information to appellant involves their potential liability *inter se,* not the liability of the county and its employees.

Appellant presented no evidence to support his allegation of negligence by Mr. Robert Slimmon, the zoning administrator, in denying appellant's application for a use permit.

## II

■ Granting that the county and its employees are insulated from liability, the appellant argues that they be estopped from asserting governmental immunity on equitable grounds. The court below, by upholding the immunity, impliedly found that they were not estopped. We agree: The necessary elements to invoke an equitable estoppel are not present in the instant case.

■ Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel:

1. The party to be estopped must be apprised of the facts;

2. He must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended;

3. The other party must be ignorant of the true facts; and

4. He must rely upon the conduct to his injury. (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245]; *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 489 [91 Cal.Rptr. 23, 476 P.2d 423]. Cf. Evid. Code, § 623.)

■ The rule governing equitable estoppel against a governmental entity has been stated as follows: "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pp. 496-497.)

In *Mansell* thousands of home owners had relied on their deeds to tidelands property in Long Beach over a period of many years. The court found that the injustice to the home owners which would result from a failure to uphold an estoppel was of sufficient dimension to justify an equitable estoppel against the state and City of Long Beach, even though the California Constitution prohibited alienation of the tidelands. It was the "rare combination of government conduct and *extensive reliance* here involved [which] will create an extremely narrow precedent for application in future cases." (3 Cal.3d at p. 500, italics added.)

It was the extent of reliance which made the *Mansell* case unique. The earlier cases frequently declared that estoppels against the government are rare and to be invoked only in extraordinary circumstances. (*County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817 [186 P.2d 124, 175 A.L.R. 747]; *Wheeler* v. *City of Santa Ana* (1947) 81 Cal.App.2d 811, 817 [185 P.2d 373].)

Subsequent cases have consistently held to this policy. *Pettitt* v. *City of Fresno* (1973) 34 Cal.App.3d 813 [110 Cal.Rptr. 262], a land use case, involved issuance of a writ of mandate directing a city to refrain from interfering with property owners' use of an entire building as a beauty salon. The building, located in an area zoned single family residential, was divided into two parts and had two street addresses, one of which had a permitted nonconforming use of multiple residential, and the other of retail commercial. After plaintiffs purchased the premises, they applied for and received a building permit, showing both addresses, and authorizing alterations to the entire building for use as a beauty salon. The court concluded that plaintiffs had purchased the property in reliance on the city's representation that both addresses had a nonconforming right of use of retail commercial, that they had spent substantial sums in reliance on the issuance of the building permit for the use of the entire premises as a beauty salon, and that the city was estopped from denying them the right to so use the entire building.

The judgment was reversed on appeal, the court concluding that "as a matter of law the City cannot be estopped to deny the validity of a permit or other representations respecting the use of property issued or made in violation of the express provisions of a zoning ordinance." (*Pettitt* v. *City of Fresno, supra,* 34 Cal.App.3d at p. 819.) The court cited the principle that estoppel will not be invoked against a government agency where it would defeat the effective operation of a policy adopted to protect the public, and it concluded that the field of zoning laws involves a vital

public interest. Permitting the violation to continue, the court reasoned, would give no consideration to the interest of the public. The court adverted to *Mansell* and held that "the public and community interest in preserving the community patterns established by zoning laws outweighs the injustice that may be incurred by the individual in relying upon an *invalid* permit to build issued in violation of zoning laws." (*Id.*, at p. 820, italics in original.)

In the case at bench, appellant relied on the invalid septic tank permit. This permit was invalid not primarily because a use permit had not been obtained but because the lot was inadequate for the large amount of waste water that would be produced. Appellant had retained a soil engineer who performed certain water percolation tests to determine the soil's ability to absorb the anticipated quantities of waste water; this, because there was no central sewage system at the building site. After the issuance of the septic tank permit, the county, after further calculations, with the result as above noted, revoked the permit.

If the county in the light of its findings were estopped to assert the invalidity of the septic tank permit and upon that finding to revoke it, the public health would be jeopardized. To raise such an estoppel against the county does not accord with the rule of *Mansell.* As noted, we are dealing with a vital public interest, not one that is strictly between the municipality and an individual private litigant.

The paramount duty in issuing a septic tank permit was to the public health and not to appellant. The duty to the public health precludes a duty to appellant's profit. Ordinance No. 1836 introduced in evidence states that it is an ordinance relating to health and sanitation. The decision as to whether a septic tank permit will be issued is determined on information submitted under section 5(b) of the ordinance. The director of public health may require such information "as may be necessary in the judgment of said director to assure that the proposed method of sewage disposal will not endanger health and sanitation."

The stated purpose of a statute or ordinance defines the duties created by it. A parallel is found in *Hecton* v. *People* ex rel. *Dept. of Transportation* (1976) 58 Cal.App.3d 653, 656 [130 Cal.Rptr. 230]. There plaintiffs claimed that Government Code section 815.6 created a mandatory duty to them by incorporating the duties of the environmental protection statutes: the National Environmental Policy Act (NEPA) 42 United States Code section 4321 et seq., and the California Environmen-

tal Quality Act (CEQA) Public Resources Code section 21000 et seq. But the court held (at p. 656) that the purpose of NEPA and CEQA was not to protect plaintiffs against the decline in the commercial value of their property but "to ensure consideration of qualitative environmental factors as well as quantitative economics in proposed actions affecting the environment." (At p. 656.) The court cited *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 254-255 [104 Cal.Rptr. 761, 502 P.2d 1049], but the language is from Public Resources Code section 21001, subdivision (g). (See *Mammoth,* 8 Cal.3d at p. 255.) As CEQA defines the duties it creates towards the environment, Ordinance No. 1836 defines the duties it creates to maintenance of the public health.

The appellant retained both a licensed building designer and a licensed contractor. Both were men of considerable professional experience. Both actively engaged in numerous activities for appellant in the planning, preparation and construction. These persons acted in an agency capacity for appellant in the obtaining of licenses and permits. The record is clearly supportive of the agency. The appellant, while denying it, concedes they have a *"special relationship"* (italics added), otherwise undefined, which required them to communicate to him their knowledge as to these matters. The relationship placed at least that burden on the designer and contractor. He has sued them for negligence in this action. Briefly, he alleges the designer negligently failed to inform him that a use permit was required in order to construct a laundromat, a fact the designer knew, and still permitted the construction to start. Appellant further alleged that the contractor negligently failed to secure a building permit for a laundromat as he had agreed to do, and further was negligent in not informing appellant that he did not have such a building permit, and nevertheless commenced construction of a laundromat.

The designer, in correspondence with the county relative to the use permit, signed as "agent" for the appellant. Both were in steady contact with the appellant, atended meetings with him on his behalf, and performed services consistent with his order and direction.

The record reflects that in the week of March 11 and prior to March 15, preliminary work was started on this structure. On March 13 at a design approval hearing attended by designer, he was notified his client would need a use permit for laundromat portion of the building. On March 15 he made application for the use permit. On the same day the contractor obtained the building permit, which eliminated the laundromat. Appellant claimed on the fourth copy of this the portion of the permit wherein

the word "laundromat" was crossed out was illegible. The other copies were not and the contractor is held to know the contents of the document and to resolve any questions that might arise from an inability, if any, to read the entire document. Thereupon work on the laundromat proceeded. ■ Under the criteria earlier listed in the *Mansell* case, the third requirement clearly is not satisfied to effect an estoppel. The appellant is charged with knowing what his agents knew. The designer's knowledge that a use permit was required and the contractor's knowledge that he did not have a building permit for a laundromat are imputed to appellant.

■ "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." (Civ. Code, § 2332.) "Thus, it is a well established rule in California that the principal is chargeable with, and is bound by the knowledge of, or notice to, his agent, received while the agent is acting within the scope of his authority, and which is in reference to a matter over which his authority extends." (*Trane Co.* v. *Gilbert* (1968) 267 Cal.App.2d 720, 727 [73 Cal.Rptr. 279].)

These facts, coupled with the fact appellant concedes construction started on the laundromat on March 11, do not establish that the appellant was "ignorant of the true state of facts."

■ Appellant further complains that evidence introduced shows the county negligently failed to inform appellant that a use permit was required. However, there is no duty on the part of the county to so inform the appellant. ■ "Mere silence will not create estoppel unless the silent party was under some obligation to speak, and a party invoking such estoppel must show that it was the duty of the other to speak, that he has been induced to act by reason of the silence, and that the silent party had reasonable cause to believe that he would so act." (*E. D. McGillicuddy Constr. Co.* v. *Knoll Recreation Assn., Inc.* (1973) 31 Cal.App.3d 891, 901 [107 Cal.Rptr. 899]; *Transport Clearings-Bay Area* v. *Simmonds* (1964) 226 Cal.App.2d 405, 427 [38 Cal.Rptr. 116]; *Schrader Iron Works, Inc.* v. *Lee* (1972) 26 Cal.App.3d 621 [103 Cal.Rptr. 106].)

■ The undisputed facts, and those urged by appellant, show the appellant's agents were informed actually or constructively that a use permit was required and the building permit did not allow for a laundromat.

## III

The last issue on appeal is whether the nonsuit granted as to the respondents designer and contractor was proper. The court below granted it on the ground that without expert testimony there could not be a jury finding of negligence. The court indicated it felt the issue as to these defendants was whether the use permit should have been obtained and by whom, and that this was not within common knowledge of a lay person. His ruling evidently was based on *Miller* v. *Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689 [106 Cal.Rptr. 1, 505 P.2d 193].

In *Miller,* a defendant homebuilder obtained a nonsuit. It had built the home at the base of a 90° curve in a road that doubled as a flood control channel. In a flood, the home was destroyed and its occupants injured and killed. The court noted that "longstanding rules governing nonsuits . . . require us to view the evidence in the light most favorable to the plaintiffs and to disregard conflicting evidence on behalf of defendant. Only if, after indulging in every legitimate inference favorable to plaintiffs, we find that there is no evidence of sufficient substantiality to support a verdict in plaintiffs' favor, can we uphold the judgment of nonsuit." (8 Cal.3d at p. 699.)

The plaintiffs in *Miller* charged the builder with negligent construction and strict liability for defects in design and construction. The builder knew that the home was to be on a flood channel. There was no testimony by a qualified expert on building practices as to what a reasonable builder would have done about the site.

The Supreme Court affirmed the nonsuit, holding that the plaintiffs had thereby neglected to prove an essential element of their case, i.e., the standard of care. The plaintiffs had argued that the trial court erred in applying a malpractice standard instead of allowing the jury to find ordinary negligence based on their common experience. "In *People* v. *Cole* (1956) 47 Cal.2d 99 . . . , we stated that 'the decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (See also *Kastner* v. *Los Angeles Metropolitan Transit Authority* (1965) 63 Cal.2d 52 57 . . . .) It is settled that 'an expert opinion is not inadmissible merely because it coincides with an ultimate issue of fact.' (*People* v. *Polk*

(1964) 61 Cal.2d 217, 233 . . . ; Evid. Code, § 805.) If the matter in issue is one within the knowledge of experts *only* and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert opinion evidence in order to establish a prima facie case. (See *Huffman* v. *Lindquist, supra,* 37 Cal.2d at pp. 473, 474-475; *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 88-89 . . . ; *Truman* v. *Vargas* (1969) 275 Cal.App.2d 976, 982-983 . . . .) [¶] Applying the above principles to the instant case we are satisfied that it was not for nonexpert minds to determine whether Noble Manors failed to exercise due care in the construction of the home. Building homes is a complicated activity. The average layman has neither training nor experience in the construction industry and ordinarily cannot determine[15] whether a particular building has been built with the requisite skill and in accordance with the standards prescribed by law or prevailing in the industry. In the instant case, the issue as to whether or not the Miller home had been negligently constructed involved a multitude of subsidiary questions bearing not only upon the erection of the structure itself but also upon the location of the house on the particular lot, the elevation of the lot, the influence of the surrounding terrain, the possibility of run-offs and floods, and the existence of the debris dam. These were not questions which the jury could have resolved from their common experience and the trial judge properly concluded that the issue of the allegedly negligent construction of the Miller residence was one within the knowledge of experts only." The *Miller* court's footnote 15 provided as follows: "We exclude from consideration those failures on the part of the builder which are so obvious, if not bizarre, that they present no problem in the determination of his negligence, as for example the installation of a fireplace without a chimney or of a second floor without any means of access to it." (*Miller* v. *Los Angeles County Flood Control Dist., supra,* 8 Cal.3d at pp. 702-703.)

In the *Miller* case, the plaintiff charged negligence in the design and construction of a residence that was in the path of runoff waters and was ultimately destroyed in a flood. While agreeing with the law set out therein, we find the case under the facts inapplicable to the present proceeding. Respondents have avoided appellant's argument that they are charged with ordinary negligence rather than with malpractice or professional negligence. The pretrial conference order as to issues stated: "A—Negligence of any defendant and whether such negligence was the proximate cause of damage to plaintiff." As already noted, while appellant concedes the question of duty to obtain the use permit may be beyond the common experience of a jury, the designer was charged with negligently failing to inform appellant that a use permit was required in

order to construct a laundromat, which fact the designer knew and yet allowed construction to start. The contractor was charged also in the pleadings and case tried on the theory that he negligently failed to secure a building permit for a laundromat which he had contracted to build and for negligently failing to inform appellant he did not have a building permit allowing construction of a laundromat, yet commenced such a construction.

The negligence standard, i.e., that of ordinary care, is relative and variable in its application, and depends upon the surrounding circumstances. (*Fouch* v. *Werner* (1929) 99 Cal.App. 557, 565 [279 P. 183].) The fundamental basis for liability is the foreseeability of harm in the particular case. (*Tucker* v. *Lombardo* (1956) 47 Cal.2d 457, 464 [303 P.2d 1041].) Ordinary care requires the avoidance of "unreasonable risk," and, therefore, turns upon the basic question of whether the foreseeable risk of danger outweighs the utility of the act or the manner in which it is done. (*Crane* v. *Smith* (1943) 23 Cal.2d 288 [144 P.2d 356]; see Rest.2d Torts, §§ 282, 289, 291, 292, 293 and 297.)

The designer concedes he is a licensed building designer with some knowledge of use permits. He further avers in determining whether he was negligent his knowledge and expertise relating to the building industry cannot be ignored. They are part of the circumstances of the case. So too with Bonanfant, a licensed, experienced building contractor.

Their conduct, evaluated in the light of due care, has nothing to do with the technical or mechanical aspects of design or construction. The jury could find negligence on their part in their ordinary conduct and relations with appellant. Sufficient facts are in the record from which a disregard of ordinary care could reasonably be inferred.

Bonanfant states the standard of care in professional negligence cases is described in general terms in BAJI Instruction No. 6.37: "In performing professional services for a client a [building contractor] has the duty to have that degree of learning and skill ordinarily possessed by reputable [building contractors], practicing in the same or a similar locality and under similar circumstances. [¶] It is his further duty to use the care and skill ordinarily used in like cases by reputable members of his profession practicing in the same or similar locality under similar circumstances, and to use reasonable diligence and his best judgment in the exercise of his professional skill and in the application of his learning, in an effort to accomplish the purpose for which he was employed. [¶] A failure to perform any such duty is negligence."

This reference begs the issue. The comment to this instruction refers us to the use note for Instruction No. 6.00 which reads: "Where plaintiff's cause of action rests solely on malpractice and not on ordinary negligence, general instructions on negligence should not be given." (*Tangora* v. *Matanky* (1964) 231 Cal.App.2d 468 [42 Cal.Rptr. 348].) Appellant herein does not base his case against the designer and contractor solely on professional negligence.

Respondents designer and contractor take the position that because the county's building construction procedures and zoning ordinances are complex and confusing, expert testimony is therefore required to explain the derelictions of each of them to the jury. In addition, the contractor reviews the complex scope of the construction industry. These positions, or arguments, obscure the simple issues upon which appellant charges these respondents. The issues, with one exception, have nothing to do with the performance or nonperformance of their professional or occupational functions.

In a nonsuit proceeding appellant is entitled to assert the evidence most favorable to him which is that designer learned that a use permit was required, did not tell appellant, and applied for a use permit without appellant's knowledge. He knew that meanwhile the construction of the laundromat was proceeding and that there was a possibility that the construction could not be used for the purpose for which he had designed it. Contractor did not procure a building permit for a laundromat and was told he didn't have a use permit for a laundromat but commenced construction of the laundromat anyway without a word to appellant.

The exception to the occupational function referred to above is that contractor's contract required him to obtain a building permit for a laundromat and he did not get one. If this is regarded as professional negligence, it is in that category of misfeasance which is so obvious that it doesn't require expert testimony to say that a person must do what he has contracted to do. (See *Miller* v. *Los Angeles Flood Control Dist., supra,* 8 Cal.3d at p. 702, fn. 15.)

These are simple straightforward acts or failures to act which have nothing to do with the intricacies of the construction industry or the complexities of the county's zoning procedures.

Appellant has not complained about the professional performances of designer and contractor as to the design of the structure, or any delay in

performing the design, or any defect in the construction of the building, or any unsatisfactory construction results. Negligence was broadly pleaded at the outset, but by the time of trial it became apparent that professional negligence was not involved, with the single exception of the obvious failure of respondent contractor to get a building permit for a laundromat.

There is no technical background or expert opinion needed to conclude from the evidence that the designer and contractor permitted a project to proceed which lacked a proper enabling permit. On this record the trier of fact could find ordinary negligence.

The judgment of nonsuit as to the County of Monterey and its employees is sustained; judgment of nonsuit as to respondents Heisinger and Bonanfant is reversed.

Racanelli, P. J., and Newsom, J., concurred.

A petition for a rehearing was denied .September 27, 1979, and appellant's petition for a hearing by the Supreme Court was denied November 8, 1979.